**UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| ANGIE KESACK, as Parent and Natural Guardian of AJK, a minor.<br><br>           Plaintiffs,<br><br>     vs.<br><br>ROBLOX CORPORATION, EPIC GAMES, INC., MICROSOFT CORPORATION, MOJANG AB, and JOHN DOES 1 - 50.<br><br><br>           Defendants. | **Case No.:** 5:25-cv-06607-MRP<br><br>**FIRST AMENDED COMPLAINT** |

## FIRST AMENDED COMPLAINT

Plaintiff AJK, a minor, via their parent and natural guardian, Plaintiff Angie Kesack, hereby brings this action against the above-captioned Defendants (hereinafter collectively referred to as "Defendants"), Roblox Corporation, Epic Games, Inc., Microsoft Corporation, Mojang AB, and DOES 1-50, to recover damages, arising from the severe injuries sustained because of AJK's use of and addiction caused by Defendants' respective video game Products. In support thereof, Plaintiff alleges and states:

## INTRODUCTION

1.      Defendants operate virtual playgrounds – online spaces specifically designed to attract children, where millions of minors gather every day to play Defendants' games. Unlike a video game cartridge or disc that a child takes home and plays alone, Defendants' online games require children to enter Defendants' digital domain, where Defendants exercise continuous control over every aspect of the experience.

2.      Defendants know more about the children using their online games than perhaps any entity in history has known about the children in their respective control. Through mandatory account registration, Defendants know each child's age. Through continuous data collection,

1

Defendants know exactly how many hours, minutes, and seconds each child has spent in their games and on their platforms – today, this week, this month, and cumulatively over years. Defendants know when a child's usage spikes. They know when usage patterns suggest compulsion. They know when a child has crossed from recreation into potentially harmful excess.

3.    Defendants are also aware that for more than four decades, scientists have known about and studied video game addiction.[1] Furthermore, Defendants are aware that for nearly two decades, science has shown that prolonged use of video games by minors can result in brain damage, cognitive decline, and physical and emotional deficits.

4.    Once inside Defendants' virtual worlds, children can only play for as long as Defendants permit. Defendants can ban or suspend any player at any time. Defendants control what the child can see, who the child can interact with, and what virtual items the child can access and/or possess.

5.    Tort law has long recognized that when an entity invites children to congregate, assumes control over them, and holds itself out as providing a safe environment, that entity bears a special relationship with those children. And because Defendants stand in a special relationship to their child-consumers, they bear a corresponding duty to protect those children from foreseeable harm, and specifically to protect the young from themselves. This principle applies equally whether the playground is made of wood and metal, or of code and pixels.

6.    Defendants breached their duty. Despite knowing exactly which users are minors, despite having the technical capability to monitor and limit excessive use, and despite publicly promising to prioritize child safety, Defendants have failed and continue to fail to protect the children in their controlled environments from the foreseeable harms of excessive gaming. Instead, Defendants designed their platforms to maximize the time children spend in their virtual

---

[1] MD Griffiths; Halley de Oliveira Miguel Pontes, *A History and Overview of Video Game Addiction*, The Oxford Handbook of Digital Technologies and Mental Health (Oct. 8, 2020) https://doi.org/10.1093/oxfordhb/9780190218058.013.2.

playgrounds, knowing that increased engagement would generate increased revenue – regardless of the cost to children's health and wellbeing.[2]

7.      Defendants' strategies have been extremely lucrative. As a result of Defendants' inclusion of addictive features in their respective Products, they have collectively generated billions of dollars, while causing and/or contributing to a public health crisis for minors suffering from addiction to and disordered use of video games.

8.      Defendant Microsoft's Xbox video game platform[3] is often where these games are played. As described herein, Defendant Microsoft designed its Xbox platform with game-like features that caused and further exacerbated addiction and disordered relationships with video games.

9.      As set forth below, because of Defendants' respective marketing efforts, Roblox, Fortnite, and Minecraft were among the first online video games played by Plaintiff AJK, and Plaintiff AJK played these games on Defendant Microsoft's Xbox platform. As each Defendant expected and intended from their decision to add addictive and manipulative programming to their Products instead of safety features, AJK developed a disordered relationship with and became addicted to video games as a result of playing Roblox, Fortnite, and Minecraft. As a result, AJK suffers from severe physical, emotional, and economic injuries, including diminished social interactions, lack of interest in other hobbies, and withdrawal symptoms such as rage,

---

[2] Addiction, as defined in the seminal article *Addictive behaviors: Etiology and Treatment,* published by the American Psychological Association in its 1988 *Annual Review of Psychology*, is:

> "a repetitive habit pattern that increases the risk of disease and/or associated personal and social problems. Addictive behaviors are often experienced subjectively as 'loss of control' – the behavior contrives to occur despite volitional attempts to abstain or moderate use. These habit patterns are typically characterized by immediate gratification (short term reward), often coupled with delayed deleterious effects (long term costs). Attempts to change an addictive behavior (via treatment or self-initiation) are typically marked with high relapse rate."

[3] Hereinafter, "Xbox" or "Xbox platform" collectively refers to all Xbox consoles (including Xbox 360, Xbox One, Xbox One S, and Xbox One X) and Xbox online game platforms (including the Xbox Network, Xbox Game Pass, Xbox Store, Xbox Live, and Xbox Cloud Gaming).

anger, and physical outbursts. Through this lawsuit, AJK seeks to hold each Defendant accountable for their respective decisions to place profits over safety, which directly and proximately resulted in AJK's significant harm.

10. The true names and capacities of the Defendants, DOES 1-50, are unknown to Plaintiffs at the time of filing this Complaint, and Plaintiffs, therefore, sue said Defendants by fictitious names and will ask leave of court to amend this Complaint to show their true names or capacities when the same have been determined. Plaintiffs are informed and believe and thereon allege that each of these fictitiously named Defendants are responsible in some manner for the occurrences alleged herein, and that Plaintiff's injuries and damages as alleged and set forth herein were proximately caused by such fictitiously named Defendants.

## PARTIES

### I. Plaintiff's Legal Parent and Natural Guardian Angie Kesack

11. Plaintiff Angie Kesack is, and at all times relevant to this action was, a citizen and resident of the Commonwealth of Pennsylvania who resides in Philadelphia County, Pennsylvania.

12. Plaintiff Angie Kesack is the biological mother of AJK, and serves as their representative in this lawsuit. Plaintiff Angie Kesack is not pursuing any claims in her individual capacity.

### II. Plaintiff AJK

13. Plaintiff AJK, a minor, is, and at all times relevant to this action was, a citizen and resident of the Commonwealth of Pennsylvania who resides in Philadelphia County, Pennsylvania. AJK is 12 years old at the time of filing this lawsuit.

14. AJK began playing video games at approximately four years old. Since that time, AJK has used and/or continues to use video games at an increasing, uncontrollable, compulsive, and/or addictive pace. This addiction began with AJK's use of Defendants' respective Products. AJK has been injured and damaged, and continues to be injured and damaged, as a result of AJK's video game addiction caused by Defendants' defective Products.

4

### III.  Defendant Roblox Corporation

15.     Defendant Roblox Corporation ("Roblox Corp.") is a Delaware corporation with its principal place of business at 3150 South Delaware Street, San Mateo, California 94403.

16.     Roblox Corp. is a video game developer and publisher that, at all times material hereto, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold its video game and platform, Roblox, either directly or indirectly, to members of the general public within the Commonwealth of Pennsylvania, including to Plaintiff AJK.

17.     As of March 6, 2023 and continuing through the present, Roblox Corp. is a foreign business corporation actively registered to do business in the Commonwealth of Pennsylvania at registration no. 12897556.

### IV.  Defendant Epic Games, Inc.

18.     Defendant Epic Games, Inc. ("Epic Games") is a Maryland corporation with its principal place of business at 620 Crossroads Blvd, Cary, North Carolina 27518.

19.     Epic Games is a video game developer and publisher that, at all times material hereto, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Fortnite video game series and platform, either directly or indirectly, to members of the general public within the Commonwealth of Pennsylvania, including to Plaintiff AJK.

20.     As of July 24, 2019, and continuing through the present, Epic Games is a foreign business corporation actively registered to do business in the Commonwealth of Pennsylvania at registration no. 6923507.

### V.     Defendant Microsoft Corporation

21.     Defendant Microsoft Corporation ("Microsoft") is a Washington corporation with its principal place of business at One Microsoft Way, Redmond, Washington 98052.

22.     Microsoft is a video game developer and publisher that, at all times material hereto, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled,

prepared, distributed, marketed, supplied, and/or sold the Minecraft video game series and platform, either directly or indirectly, to members of the general public within the Commonwealth of Pennsylvania, including to Plaintiff AJK.

23.     At all times material hereto, Microsoft designed, developed, tested, patented, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Xbox Platform – on which Roblox, Fortnite, and Minecraft could be played – to members of the general public within the Commonwealth of Pennsylvania, including to Plaintiff AJK.

24.     As of July 14, 1998, and continuing through the present, Microsoft is a foreign business corporation actively registered to do business in the Commonwealth of Pennsylvania at registration no. 2826638.

## VI.     Defendant Mojang AB

25.     Defendant Mojang AB ("Mojang") is a Swedish company with its principal place of business at Söder Mälarstrand 43, 118 25 Stockholm, Sweden.

26.     Mojang is a video game developer and publisher that, at all times material hereto, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Minecraft video game series and platform, either directly or indirectly, to members of the general public within the Commonwealth of Pennsylvania, including to Plaintiff AJK.

27.     In September 2014, Defendant Microsoft acquired Defendant Mojang and its intellectual property (including Minecraft) for $2.5 billion. Accordingly, Defendant Mojang is now a wholly-owned subsidiary of Defendant Microsoft.

28.     Although Mojang initially developed, sold, and maintained Minecraft, following its acquisition by Microsoft, both Microsoft and Mojang have played direct roles in changes made to the design, development, testing, assembly, manufacturing, publishing, packaging, labeling, preparation, distribution, marketing, supply, and/or sale the Minecraft video game series that Plaintiff AJK began playing. Indeed, both Mojang and Microsoft are responsible for

the addictive design features in Minecraft described herein. Both Mojang and Microsoft have direct liability for the harm and injuries caused by Minecraft based on their own conduct.

## JURISDICTION AND VENUE

29.     Plaintiff AJK realleges and incorporates by reference all of the foregoing allegations as if repeated in full here.

30.     This suit alleges causes of action seeking relief arising under the laws of the Commonwealth of Pennsylvania, including but not limited to the allegation that as a direct and proximate result of the Defendants' respective Products and each Defendant's negligent, deceptive, willful, immoral, reckless, and unlawful actions and inactions, representations and misrepresentations, including by omission, Plaintiff AJK suffered and continues to suffer injuries and damages within the Commonwealth of Pennsylvania.

31.     Plaintiff has suffered and continues to suffer both injuries and damages within the Commonwealth of Pennsylvania that exceed the sum or value of $75,000, exclusive of interest and costs.

32.     This Court has original subject matter jurisdiction over the claims pursuant to 28 U.S.C. § 1332 because the controversy is between citizens of different states.

33.     This Court has general consent personal jurisdiction over Defendants Roblox Corp., Epic Games, and Microsoft under 42 Pa.C.S. § 2301(a)(2)(ii) as all three Defendants are registered to do business in Pennsylvania.

34.     This Court also has general consent personal jurisdiction over Defendant Mojang under 42 Pa.C.S. § 5301(a)(2)(ii) because although Mojang is not registered to do business in Pennsylvania, its parent corporation, Microsoft Corporation, is. In Pennsylvania, if a subsidiary is an agent of its parent corporation, or the parent corporation controls the subsidiary, then personal jurisdiction applies to the subsidiary when it also applies to the parent corporation.[4]

---

[4] *Botwinick v. Credit Exch., Inc.,* 419 Pa. 65, 213 A.2d 349, 35 (1965).

35.     This Court also has specific personal jurisdiction over Defendants Roblox Corporation, Epic Games, Microsoft and Mojang under 42 Pa.C.S. § 5322(a)(1)-(4) because they have each transacted business in the Commonwealth, supplied services or things in the Commonwealth, and caused tortious injury in the Commonwealth.

36.     Specifically, Plaintiff AJK resides in the Commonwealth of Pennsylvania and as a result of each Defendants' contacts with Pennsylvania, Plaintiff purchased and/or downloaded each Defendant's game and used and/or accessed Microsoft's Xbox's online gaming platform (Xbox Live, Xbox Network, Xbox Game Pass, Xbox Cloud Gaming and/or others) in Pennsylvania, Plaintiff played each Defendant's game and used Microsoft's Xbox Platform and subsequently developed and addiction to video games because of their use of each Defendant's game and Microsoft's Xbox Platform in Pennsylvania, and Plaintiff suffered severe harm as a result in Pennsylvania.

Venue is proper in this District because, among other things: (1) each Defendant directed its activities at residents in this District; (b) each Defendant conducted substantial business in this District; (c) a substantial part of the activities giving rise to this action occurred in this District; and (d) Plaintiff AJK was, and continues to be, harmed in this District.

## GENERAL FACTUAL ALLEGATIONS

37.     In 2023, 65% of Americans of all ages played video games every week.[5] In 2024, experts reported that roughly 85% of teenagers say they play video games, with 97% of boys and 73% of girls reporting video game usage.[6] Further, more than 90% of children older than two years old play video games, and "[c]hildren 8 to 17 years of age spend an average of 1.5 to 2

---

[5] Crosby Armstrong, *Video Games Remain America's Favorite Pastime With More Than 212 Million Americans Playing Regularly*, Ent. Software Ass'n (Jul. 10, 2023), https://www.theesa.com/video-games-remain-americas-favorite-pastime-with-more-than-212-million-americans-playing-regularly/.
[6] Jeffrey Gottfried & Olivia Sidoti, *Teens and Video Games Today*, Pew Res. (May 9, 2024), https://www.pewresearch.org/internet/2024/05/09/teens-and-video-games-today/.

hours daily playing video games."[7] This research dramatically emphasizes the idea that video game usage has become fundamental in the life of an American child.

## I.   Extensive Video Game Usage Damages Adolescent Brains

38. For almost two decades, research on the interaction between video game usage and the adolescent brain has shown that extensive usage has a severe impact on the adolescent brain, including loss of grey matter, which leads to severe physical and mental effects on the child. Many of these effects are indicators or consequences of Internet Gaming Disorder ("IGD"), which is the addiction to video gaming.

39.   One of the ways that the impact of video game usage is studied is research about the role dopamine plays in the brain during gameplay.

40.   Video games can and do cause an intense dopamine release in the user that is similar in magnitude to that experienced by substance abuse or gambling. Dopamine is a neurotransmitter made in the brain that acts as a chemical messenger that communicates messages between nerve cells in the brain, as well as between the brain and the body. Dopamine serves as the brain's all-important "reward center" and, in addition, plays a critical role in several body functions including attention, mood, pleasurable reward and motivation, sleep, learning, and movement. The release of dopamine causes demonstrable physical, mental, and emotional responses in the human brain and body. This is especially true in minors, and particularly neurodivergent minors, whose brains are still developing. Increased frequency of dopamine releases can lead to withdrawal symptoms, including anger, irritability, or physical outbursts when the game is made unavailable.

41.   The repetitive release of dopamine creates, reinforces, and strengthens a dysregulated or dopaminergic neural pathway that propels the user to hyperfocus on using the video games more and more, first at an increasing rate and then with compulsive desire until the impulse to use the video games develops into a disordered use or addiction.

---

[7] Daniel Alanko, *The Health Effects of Video Games in Children and Adolescents*, Pediatr. Rev. (Jan. 1, 2023).

42.    Those dysregulated neural pathways trigger addictive, compulsive, and impulsive behaviors outside of the gaming world consisting of life-altering impulsivity and inhibitory control behaviors that can and do cause a myriad of catastrophic physical, mental, and emotional disorders, symptoms, and injuries, including other addictions, significant withdrawal symptoms, maldevelopment of the brain's frontal lobe, dissociative behaviors, social isolation, damage and/or negative consequences to cognitive processes, attention disorders, severe depression, morbid obesity, mal and/or undernutrition, and other harmful effects, all to the severe detriment and damage to the minor, and to the severe emotional detriment and pecuniary or economic damage to their families and caretakers.

43.    Additional research on the impact of video games reports physical changes to the brain and brain matter as a result of gameplay.

44.    Research has shown that prolonged use of video games damages the prefrontal cortex of the user, causing a loss of grey matter, lower cognitive function, and an inability to regulate impulse control. Research has also concluded that such use of video games may lead to negative effects like stress, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders.

45.    Clinical evidence has shown that users addicted to online games experience biopsychological symptoms and complications, including symptoms traditionally associated with substance abuse and addiction, such as hangovers, changes in mood, ability to adapt, withdrawal, conflict, and recurrence symptoms.

46.    Empirical studies indicate that gaming disorders are associated with detrimental health-related outcomes.

47.    Brain imaging studies have shown that excessive use of video games negatively affects the brain regions responsible for reward, impulse control, and sensory-motor coordination.

48.     Other studies have shown that disordered and/or excessive use of video games leads to negative consequences on cognitive processes, including multi-second time perception, inhibition, and decision-making.

49.     During adolescence, the prefrontal cortex—the locus of judgment, decision-making, and impulse control—is still developing and undergoing major reorganization. This region of the brain does not reach maximum capacity until the age of 25 to 30. The executive control center of the prefrontal cortex is essential to one's ability to healthfully weigh risks and rewards and for pausing the pursuit of immediate rewards in favor of more adaptive longer-term goals. The lack of full development of the prefrontal cortex is arguably why young people are more likely to engage in hours of use while ignoring basic needs like food, sleep, and hygiene. Without mature frontal lobes, minors are less able to weigh potential negative consequences and curb potentially harmful behavior like excessive use of video games, which further impacts frontal lobe development.

50.     Brain imaging studies related to IGD have shown structural changes in the brain, particularly a reduction in white-matter density (consisting mostly of cells and axons that transmit signals from the cerebellum to other brain regions) and grey-matter volume (associated with emotions, perception, memory, and motor control). Specifically, studies showed several regions of the brain demonstrated reduction in grey-matter volume in gaming disorder participants, as depicted here:[8]

---

[8] Livny, Weinstein, and Weizman, *New Developments in Brain Research of Internet and Gaming Disorder*, 75 Neurosci. Biobehav. Rev. 314 (Apr. 2017).



51.     Brain activation studies have shown that the use of video games causes changes in the reward and impulse control regions of the brain, and that engaging with video games activates regions of the brain in a manner similar to the way the brain is activated in response to cue-exposure to drugs (whereby addicts are exposed to relevant drug cues to extinguish conditioned responses).

52.     Additional brain activation studies have shown that individuals with gaming disorders have impaired inhibitions, and that video game cues activate craving, attention, and executive function areas of the brain. Those cognitive, sensory-motor, and emotional processes may be associated with long-term changes to the brain because of prolonged use of video games. Regions that showed activation in response to video game cues in gaming disorder participants in more than two studies are depicted in the following image:[9]



53.     Structural studies of the brain have shown alterations in the volume of the ventral striatum (a critical component of motor and reward systems in the brain) are possible because of changes in reward regions of the brain. One comparison study of young adults with a mean age

---

[9] Aviv Weinstein et al., *Neurobiological Mechanisms Underlying Internet Gaming Disorder*, 22(2) DIALOGUES CLIN. NEUROSCI. (2020).

of 24 revealed that individuals who engage in excessive use of video games tend to have lower cognitive function, particularly in areas of verbal ability and working memory.

54. Research has shown that a neurodivergent minor with a diagnosis of Attention-Deficit Hyperactivity Disorder ("ADHD") or Autism Spectrum Disorder is at a higher risk of developing video game disorder or addiction, which can worsen one's ability to control impulsivity and result in brain damage.[10] Research has shown that while use of video games may foster creativity in some minors, such potential benefits are outweighed by the risk of developing addiction or disordered use of video gaming products, which typically develops swiftly in minors and neurodivergent individuals. This is particularly true when the video games incorporate addictive and manipulative tactics, as well as other problematic psychological programing.

## II. Gaming Addiction Is a Recognized and Diagnosable Condition

55. Addiction to and disordered use of video games and internet gaming is a recognized, diagnosable mental disorder and form of behavioral addiction codified by the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5).[11] The diagnostic symptoms of internet gaming disorder currently set forth in DSM-5 include: (1) Preoccupation with playing and/or using video games; (2) Withdrawal symptoms (sadness, anxiety, irritability, and/or other unpleasant symptoms) when access to play and/or use is removed, precluded, or reduced; (3) Tolerance - the need to spend more time playing and/or using video games to satisfy the urge and desire to do so; (4) Loss of Control or the inability to reduce video game playing and usage time and/or unsuccessful attempts to quit gaming; (5) Giving up other activities or loss of interest in previously enjoyed activities due to compulsion to play video games; (6) Continuing to play and use video games despite negative or problematic consequences; (7) Deceiving family members or others about the amount of time spent playing and/or using video games; (8) Using video games to "escape" or relieve negative moods, such

---

[10] Micah O. Mazurek & Christopher R. Engelhardt, *Video Game Use in Boys with Autism Spectrum Disorder, ADHD, or Typical Development*, 132 Am. Acad. of Ped. J.L. 2 (2013).
[11] It is also recognized in the recently released Diagnostic and Statistical Manual of Mental Disorders, Text Revision (DSM-5-TR).

as guilt or hopelessness; and (9) Jeopardized school or work performance or relationships due to playing and/or using video games.

56.    Nationally recognized institutions such as the Cleveland Clinic and the National Center for Biotechnology Information (NCBI) also recognize video game addiction and categorize the addiction as falling under the general category of IGDs.[12]

57.    As of 2022, "Gaming disorder"—disordered use of and/or play with video games—is a recognized mental health disorder by the World Health Organization and International Statistical Classification of Diseases and Related Health Problems. "Gaming disorder" is included within the subcategory "ICD-11" entitled "Disorders due to substance use or addictive behaviors."[13]    "Gaming disorder" is defined in the 11th revision of the International Classification of Diseases as a pattern of persistent or recurrent gaming behavior, specifically "digital gaming" or "video-gaming," which may be online or offline, manifested by: impaired control over gaming (e.g., onset, frequency, intensity, duration, termination, context); increasing priority given to gaming to the extent that gaming takes precedence over other life interests and daily activities; and continuation or escalation of gaming despite the occurrence of negative consequences.

**III. Historical Development — How Video Games Moved from Cartridges to Virtual Worlds**

58.    Video games were first developed in or around the 1950s. Initially, games were only available to be played by the general public in arcades. Beginning in the 1970s, however, the first at-home video game devices ("consoles") appeared on the market.

59.    Early video games bore no resemblance to the games and platforms at issue in this case. A child who played Pac-Man at an arcade or Super Mario Bros. on a home console was interacting with a machine — a self-contained product purchased or rented by the child's parent.

---

[12] Shabina Mohammad, Raghad A Jan, & Saba L Alsaedi, *Symptoms, Mechanisms, and Treatments of Video Game Addiction*, Cureus (Mar. 31, 2023).
[13] Other disorders found in that subcategory include alcoholism and gambling addiction.

The game developer had no knowledge of the child's identity, age, playing habits, or location. There was no ongoing relationship between the developer and the player, no mechanism for the developer to monitor the child's behavior, and no ability for the developer to intervene in how or how long the child played. The relationship between developer and player was no different from the relationship between any manufacturer and any end consumer of a tangible good.

60.     By the late 1990s and early 2000s, internet connectivity transformed the video game industry. Multiple at-home consoles — such as the Microsoft Xbox, Sony PlayStation, and Nintendo's Wii — brought gaming into the living room, and over the following decade, video games expanded to mobile devices and tablets, vastly increasing accessibility.

61.     But the most consequential change was not one of accessibility — it was a change in kind. Modern video games — including Roblox, Fortnite, and Minecraft — are not one-off purchases in any traditional sense. They are persistent, developer-operated virtual environments where millions of children congregate daily. These platforms function as digital playgrounds, summer camps, and after-school gathering places, all controlled and operated by the game developer in real time. Unlike the cartridge and disc-era games of prior decades, these platforms require users to create individual accounts and provide personal information including their date of birth. The developer knows who each user is, how old they are, when they log on and off, how long they play, what they do while playing, and with whom they interact.

62.     In 2024, there were 1.17 billion gamers online, and global gaming revenues are at least $176.06 billion.[14] Many of these games — including Roblox, Fortnite, and Minecraft — can be played on multiple different consoles, mobile devices, and tablets, and can be delivered through digital downloads, online gaming networks, and cloud gaming services. The result is that children can access these persistent virtual environments from virtually any internet-connected device, at any time.

---

[14] Jasmine Katatikarn, *Online Gaming Statistics and Facts: The Definitive Guide (2024)*, Acad. of Animated Art (Jan. 16, 2024), https://academyofanimatedart.com/gaming-statistics/.

63.     As the sophistication of gaming devices and delivery methods has increased, so too has the sophistication of the games themselves. Unlike their predecessors, many modern-day games are enormous in scale, providing countless hours of non-repetitive, unique gameplay that allows players to become deeply immersed in the world of the game. Platforms like Roblox, Fortnite, and Minecraft function not merely as games but as virtual worlds – digital spaces where children congregate, socialize, create, and spend significant portions of their daily lives.

64.     The ways in which game developers monetize their games have also changed in ways that deepen the ongoing relationship between developer and consumer. In the past, game developers earned revenue primarily through the one-time sale of their games. But, if a cliché can be used—the game has changed.

65.     Modern developers — including Defendants — allow their games to be downloaded for no or minimal cost and generate revenue through ongoing purchases made within the game, known as "microtransactions." These include cosmetic customizations for the player's character (e.g., hats, uniforms, hair styles), "boosters" that help their character perform better or progress faster within the game, and "season passes" that allow players to access exclusive in-game content.

66.     Game developers that offer their games at no or low cost, such as Defendants, rely on microtransactions to turn a profit. The design and marketing strategy associated with such games is rooted, in part, in the theory that the revenue from an ongoing microtransaction system will outweigh the revenue from a one-time-purchase game. Microtransaction spending can easily add up to hundreds, or even thousands, of dollars from an individual user.

67.     This monetization model means that — unlike the cartridge and disc-era developer who profited from a single sale and had no further contact with the consumer — modern game developers have a direct, ongoing, and financially motivated relationship with each individual user. Indeed, Defendants' revenue depends not on selling a product, but on keeping identified users, including identified minor users, engaged within the platform for as long and as frequently as possible.

68.     Accordingly, modern gaming companies, including Defendants, have a financial incentive which pushes them in the opposite direction of their duty to protect children from themselves. To be sure, it is evidenced by their behavior: Defendant game developers enlist PhD behavioral psychologists and use research to manipulate children with a goal of increasing the amount of time spent in game, thereby prolonging the minors' exposure to in-game marketing for in-game purchases in order to improve the odds players will engage with microtransactions that generate profits for the game developer.

**IV. Defendants' Relationship with Their Child-Customers Constitutes a Special Relationship Under Tort Law**

69.     Pennsylvania tort law imposes an affirmative "duty to exercise reasonable care to protect" when a "special relationship" exists between a defendant and a plaintiff. *Feleccia v. Lackawanna College*, 654 Pa. 324, 343-44 (2019) (citing *Dittman v. UPMC*, 349 Pa. 496 (2018) (citations omitted). Such relationships are often characterized by dependency, control, bounded identification, and reasonable expectations of protection. *See e.g. Kleinknecht v. Gettysburg College*, 989 F.2d 1360, 1366-69 (3rd Cir. 1993); Restatement (Third) of Torts: Phys. & Emot. Harm § 40 (2012); Restatement (Second) of Torts § 314A (1965). Defendants' relationships with their minor users satisfies each of the characteristics of a special relationship and therefore imposes on Defendants and affirmative duty of protection.

**A.  Dependency and Vulnerability**

70.     "Generally, the relationship has an aspect of dependency in which one party relies to some degree on the other for protection." *57A Am. Jur. 2d Negligence § 80*. A typical setting for the recognition of a special relationship is where the plaintiff is particularly vulnerable and dependent upon the defendant who, correspondingly, has some control over the plaintiff's welfare. Upon information and belief, modern game developers, including Defendants, knew that minors were engaging with their Products and utilized child development experts and/or psychologists to design their games with a specific goal of attracting and addicting minors to their Products.

71.    Minor users of Defendants' Products are particularly vulnerable. Scientific research, of which Defendants are aware, has established that minors' developing brains are especially susceptible to the addictive design features incorporated into Defendants' virtual environments. Minors lack the neurological development to resist operant conditioning techniques that target their dopamine receptors. This vulnerability is precisely why Defendants targeted minors in the first place – their susceptibility made Defendants more profitable. "Operant conditioning" is a form of behavioral manipulation that uses rewards and punishments to influence behavior. Through operant conditioning, rewarded behavior is likely to occur more frequently, while the frequency of punished behavior decreases.

72.    Minor users are also dependent on Defendants for protection. Once a minor enters Defendants' digital environments, they cannot protect themselves from the addictive design features embedded in the video game environments. Minors cannot see the algorithms that manipulate their behavior, cannot understand the psychological techniques deployed against them, and cannot access the data showing their own usage patterns. Only Defendants have the ability to provide meaningful protection within their platforms, yet have failed and continue to fail to do so.

**B. Control Over the Means of Protection**

73.    "The corollary of dependence in a special relationship is control. Whereas one party is dependent, the other has superior control over the means of protection." *See e.g. Regents of Univ. of Cal. v. Superior Court*, 413 P.3d 656 at 665 (Cal. 2018).

74.    Defendants exercise comprehensive control over the digital environments where minor users spend substantial time. Defendants control: (a) what content minors can access; (b) what communications minors can send and receive; (c) what features and design elements minors encounter; (d) what data is collected about minors' behavior; and (e) what safety measures, if any, are implemented.

75.    Defendants have the technical capability to identify excessive use patterns by specific minor users. Defendants collect detailed data on usage duration, frequency, spending

patterns, and engagement metrics for each user. Defendants have the ability, but chose not to exercise it adequately, to alert parents, impose usage limits, or intervene when a minor's usage patterns indicate harmful excessive engagement.

76.    Defendants demonstrated their control by implementing certain age-based restrictions. For example, Roblox restricts users under 9 to "Minimal" and "Mild" content only, automatically limits communications based on age, and (beginning in 2024) offers screen time controls. Likewise, Fortnite imposes automatic restrictions on communication for users under 13 and a $100 daily spending limit for minors. These voluntary undertakings demonstrate that Defendants possess, and have exercised, the control necessary to protect minor users.

**C. Bounded Relationship with Identifiable Individuals**

77.    Special relationships also have defined boundaries. They create a duty of care owed to a limited community, not the public at large. *See Kleinknecht*, 989 F.2d at 1368. "A [special] relationship identifies a specific person to be protected and thus provides a more limited and justified incursion on autonomy, especially when the relationship is entered into voluntarily." Restatement (Third) of Torts: Phys. & Emot. Harm § 40 (2012), com. h.

78.    Defendants' relationship with their minor users is precisely bounded. Defendants require account creation, through which they collect age information. Based on that age information, Defendants categorize users and apply differential treatment. Defendants know exactly which users are minors. For Roblox, over 45% of daily active users are under 13 years old. Defendants' duty runs not to the public at large, but to specifically identified minor users whose age Defendants have affirmatively collected and recorded.

79.    This bounded relationship distinguishes Defendants from entities that owe only general duties to the public. Unlike a police department that owes duties to all citizens in its jurisdiction, Defendants have specifically identified a class of vulnerable users (minors), collected their information, and undertaken to provide differential protection to that identified group.

19

**D. Benefit to Defendants and Reasonable Expectation of Protection**

80.     Special relationships often exist in settings where the relationship provides a benefit to the party charged with the duty. *Kleinknecht*, 989 F.2d at 1368; Restatement (Third) of Torts: Phys. & Emot. Harm § 40 (2012), com. h. For example, innkeepers have a special relationship with their guests in part because innkeepers benefit from the presence of those guests. Likewise, parties in special relationships often have a "reasonable expectation, fostered in part by [defendants] themselves, that reasonable care will be exercised to protect [them] from foreseeable harm." *Regents*, 413 P.3d at 621; *see also Kleinknecht*, 989 F.2d at 1367 (defendant owed a duty of care where it supervised the events which caused harm).

81.     Minor users and their parents have a reasonable expectation that Defendants will protect minors from foreseeable harm. Defendants have cultivated this expectation through their public representations. Roblox has publicly stated that "safety underpins everything we do at Roblox, particularly the safety of our youngest users" and that it has "built a platform with safety at the foundation." Epic Games has assured users that it wants Fortnite to be a "safe place for [users] to play games." These representations create a reasonable expectation that Defendants will exercise reasonable care to protect minors.

82.     Parents allow their children to use Defendants' Products in reliance on these representations and on the visible age-based safety restrictions Defendants have implemented. Parents reasonably expect that when a platform collects a child's age, implements age-based restrictions, and publicly commits to child safety, the platform will exercise reasonable care to protect that child from foreseeable harms, including the harm of excessive, addictive use.

83.     Additionally, Defendants derive substantial benefit from their relationship with minor users. Minor users generate significant revenue for Defendants through in-game purchases and extended engagement that increases advertising value. Defendants' business models depend on attracting children to their virtual playgrounds and then maximizing the time minors spend on the platforms. This benefit relationship further supports the recognition of a special relationship.

## DEFENDANT SPECIFIC ALLEGATIONS

**Roblox**

### A.    Roblox Gameplay Basics

84.    Roblox is a video game and platform that was developed and published by Roblox Corporation. The game was released in September 2006.

85.    At present, Roblox has approximately 97.8 million daily active users.[15]

86.    More than 45% of the consumers playing Roblox are under age 13.[16]

87.    Roblox is available to play on gaming consoles, computers, tablets, and cellular devices.

88.    Roblox is an online game that is free to download and play, making it easily accessible to all users, including minors.

89.    Individuals that wish to play Roblox must create a Roblox account.

90.    In order to create a Roblox account, individuals must include a birthdate, username, and password.

91.    Users of any age can create a Roblox account, though users cannot enter a birth date for any year after 2020. Roblox Corp. does not require users to verify their age when creating a Roblox account. Accordingly, users can represent that they are younger or older than their actual age.

92.    Users are also not required to obtain parental consent to create a Roblox account nor to play Roblox.

93.    After creating an account, all users are assigned a default player avatar – a cartoonish character that represents the individual user within certain games. This avatar can be customized with different outfits and appearances through in-game purchases made in the in-game Roblox store using in-game currency known as Robux.

---

[15] Roblox Corp. Homepage, https://corp.roblox.com/ (last visited July 24, 2025).
[16] *The Roblox User Base,* Roblox Creator Hub, https://create.roblox.com/docs/production/roblox-user-base (last visited July 24, 2025 ).

94.    Robux can be obtained by (a) purchasing it with real currency; (b) receiving a recurring stipend given to users with a Roblox Premium membership; and (c) earning it from selling "game passes" or "developer Products" to other Roblox players.

95.    Robux sales, and the revenue generated therefrom, increase as the number of active daily and active monthly Roblox users increases.

96.    Roblox has hosted over 3.7 billion virtual transactions on its platform.[17]

97.    Roblox Corp. offers a Premium Membership option to users, which can be purchased with Robux. A Premium Membership offers users exclusive items and discounts, Premium-only levels within certain games, the ability to trade items with other users, and a stipend of Robux that defrays the purchase cost of the Premium Membership.

98.    Roblox gameplay is unique and different from many "traditional" games. When an individual "plays" Roblox, they open the Roblox platform, where they are presented with a myriad of games (known as "experiences") they can play.

99.    Roblox Corp. groups each "experience" into four content-based categories: Minimal, Mild, Moderate, and Restricted. Once the user creates an account, the user can access almost all of Roblox's content if they represent they are over 8 years old. If a user is under 9 years old, they are only able to view Minimal and Mild content. If the user indicates they are between the ages of 9 and 17, the only content not accessible is content specifically marked as "Restricted," which requires ID verification to view.

100.    These "experiences" or games available on Roblox are further sorted into different genres/categories, including but not limited to: Sports, Role-Playing Games (RPG), Fighting, First Person Shooters (FPS), Horror, Comedy, Military, and Naval.

101.    The games available to any particular user will vary based upon the age they entered when generating their account and what games Roblox's algorithm recommends to the user.

---

[17] *Earning on Roblox*, Roblox Creator Hub, https://create.roblox.com/docs/production/earning-on-roblox (last visited Aug. 23, 2024).

102.    While within the Roblox platform, players can jump back and forth between the games Roblox presents to each player.

103.    Most games available on the Roblox platform were not directly made by Roblox Corp. Rather, the Roblox platform includes a game design feature, as detailed below, whereby Roblox teaches users and provides tools for users to generate their own games and make them available on the Roblox platform for others to play.

**B.      Roblox Corp.'s 2024 and 2025 Changes to Safety Settings**

104.     In November of 2024, Roblox Corp. announced, "major updates to [its] safety systems and parental controls."[18] It claimed these updates were implemented because "safety is and always has been foundational to everything [it does] at Roblox."[19]

105.    The changes Roblox Corp. made in 2024 included new labels for categories of content, changes to viewable content for each age group, parental controls for minors' screen time usage, and a new minimum age at sign up.

106.    In April of 2025, Roblox Corp. implemented further updates to parental controls, stating that "[s]afety underpins everything we do at Roblox, particularly the safety of our youngest users."[20] These 2025 updates included the ability for guardians to view their minor's top Roblox games the minor has played and how long the minor spent in each game for the past week. Guardians can now also block specific games and experiences for their minors.

107.    Prior to the 2024 changes, Roblox Corp. allowed all users, regardless of age, to view any content other than that marked "17+." In fact, users as young as 2 or 3 could view any content on the platform that was not protected by age verification. Beginning in 2024, Roblox Corp. imposed stricter limits on the content viewable to users that represent they are younger

---

[18] *Major Updates to Our Safety Systems and Parental Controls*, Roblox Newsroom, https://corp.roblox.com/newsroom/2024/11/major-updates-to-our-safety-systems-and-parental-controls (last visited Nov. 25, 2024).
[19] *Id.*
[20] Matt Kaufman, *New Tools for Parents to Personalize Their Child's Experience on Roblox*, Roblox Newsroom, https://corp.roblox.com/newsroom/2025/04/new-parental-controls-on-roblox (last visited Apr. 7, 2025).

than 9 years old. Even after these changes, however, users that represent they are older than 8 can still access all content not marked as "17+."[21]

108.    Until 2024, Roblox Corp. did not provide parental controls for minors' screen time and usage on Roblox. Roblox Corp. could have allowed parent-imposed time limits, but instead chose not to allow parents to set time limits on their minor's Roblox account for over eighteen years of operation.

109.    Until approximately September 2024, Roblox Corp. allowed users to represent their age as young as one year old and have access to virtually all content on the platform. Even now, parents whose minors are over the age of 12 cannot set restrictions on spending limits, set time limits, change privacy settings, or manage friends and communication on their minor's account.[22] Roblox Corp.'s changes to parental controls in 2025 did not address these failures to protect and limit minor users.

110.    Until 2025, Roblox Corp. did not provide guardians with the ability to block specific games and experiences, nor for guardians to view how much time their minor spends in each respective game.

111.    The implementation of these restrictions and changes by Roblox Corp. in 2024 and again in 2025 demonstrates its understanding of its responsibility to implement such restrictions and safety measures, and further, demonstrates how easily Roblox Corp. can implement restrictions and safety measures in general. These changes also demonstrate that Roblox Corp. has control over access to not only its platform, but the games users are able to access on its platform. The changes that Roblox Corp. implemented in 2024 and in 2025 did not require game by game review by Roblox Corp., but instead were implemented as system-wide updates.

112.    Roblox Corp. admits in publicly filed documents that it has the ability to "dynamically apply relevant content filters, anti-addiction rules, payment limits, parental consent

---

[21] "17+" content is now known as "Restricted" content on Roblox.
[22] *Major Updates to Our Safety Systems and Parental Controls*, Roblox Newsroom, https://corp.roblox.com/newsroom/2024/11/major-updates-to-our-safety-systems-and-parental-controls (last visited Apr. 8, 2025).

requirements, and certain other regional requirements."[23]

113.    Despite its ability to implement anti-addiction rules, specific parental controls, payment limits, and restrictions, upon information and belief, Roblox Corp. instead chooses not to implement those restrictions in order to increase its profit.[24]

### C.    Roblox is Marketed to Minors Yet Lacks Adequate Safety Features

114.    Roblox Corp. does not inform users of the inherent risks involved with using and playing Roblox, specifically excluding that Roblox was designed to addict users to their extreme harm and detriment.

115.    Instead, Roblox Corp. provides users, potential users, and guardians false assurances of safety.[25] For example, Roblox Corp. states that:

    a.    it has "built a platform with safety at the foundation."[26]

    b.    it "spend[s] hundreds of millions of dollars each year to meet [its] safety mission."[27]

    c.    users should "learn about how Roblox's commitment to safety and civility helps students grow."[28]

---

[23] Roblox Corporation, Form 10-K (Feb. 18, 2025), p. 14 (https://www.sec.gov/ix?doc=/Archives/edgar/data/0001315098/000131509825000033/rblx-20241231.htm). *See e.g.*, Roblox Corporation, Form 10-K (Feb. 25, 2022), p. 15 (https://www.sec.gov/ix?doc=/Archives/edgar/data/0001315098/000131509822000058/rblx-20211231.htm); Roblox Corporation, Form 10-K (Feb. 28, 2023), p. 14 (https://www.sec.gov/ix?doc=/Archives/edgar/data/0001315098/000131509823000035/rblx-20221231.htm); Roblox Corporation, Form 10-K (Feb. 21, 2024), p. 15 (https://www.sec.gov/ix?doc=/Archives/edgar/data/0001315098/000131509824000026/rblx-20231231.htm).

[24] *See* Roblox Corporation, Form 10-Q (May 1, 2025), p. 68 (https://www.sec.gov/ix?doc=/Archives/edgar/data/0001315098/000131509825000118/rblx-20250331.htm ("…[R]equirements for verified parental consent before allowing children to create an account may limit the use of our Platform or reduce our overall demand for our Platform, which would harm our business, financial conditions, and results of operations").

[25] Matt Kaufman, CFO, *Driving Civility and Safety for All Users,* https://corp.roblox.com/newsroom/2024/07/driving-civility-and-safety-for-all-users (last visited Apr. 8, 2025).

[26] *Id.*

[27] *Id.*

[28] *Education*, Roblox, https://education.roblox.com/ (last visited Aug. 28, 2024).

d. its age recommendations for its Product are "grounded in child development research and informed by industry standards," essentially confirming its reliance on scientific research about adolescent development and content consumption.[29]

e. its recommendations are created by "examin[ing] global industry standards and consult[ing] child development experts"[30]; and

f. its Product is part of the "[n]ew era of teaching and learning," and teaches educators how to "pilot Roblox in [their] class or school district," assuring parents, educators, and students that its Product is safe for use of all ages.[31]

116. While Roblox does feature some parental controls in its Product, almost all of these parental controls can only be applied to minors' accounts if the minor is under 13, despite Roblox Corp.'s alleged desire to create one of the safest online environments.

117. None of Roblox's parental controls (aside from content restrictions) are automatically applied or required when a minor creates an account. A minor can easily create an account and bypass any parental controls if their guardian is unaware of the account or the ability to enable parental controls.

118. Roblox Corp. states on its website that[32]:

> ▼ **First, get the go-ahead**
>
> If you're under 13 years old, please get permission from your parent or guardian to use Roblox. You shouldn't use our Services without their go-ahead.

119. Despite its acknowledgement that users under 13 should not "use [its] services without their [guardian's] go-ahead," Roblox Corp. provides absolutely no safeguards or

---

[29] Allowed Experience Controls, Roblox, httbuildps://en.help.roblox.com/hc/en-us/articles/8863284850196-Allowed-Experiences-Controls (last visited Apr. 8, 2025).
[30] *Content Maturity Labels*, Roblox, https://en.help.roblox.com/hc/en-us/articles/8862768451604-Content-Maturity-Labels (last visited Apr. 8, 2025).
[31] *Education*, Roblox, https://education.roblox.com/ (last visited Aug. 28, 2024).
[32] *Roblox Privacy and Cookie Policy*, Roblox, https://en.help.roblox.com/hc/en-us/articles/115004630823-Roblox-Privacy-and-Cookie-Policy (last visited July 24, 2025).

requirement of parental consent when making an account, even if that user represents they are under the age of 13. Further, this instruction regarding parental permission does not reasonably coexist with Roblox Corp.'s acknowledgement that its game was created for children.

120.    Roblox Corp. could, but chooses not to, require express parental consent for minors under 13 to create an account. Despite its acknowledgement that minors should get permission from guardians before using its Product, Roblox Corp. fails to require parental consent.

121.    Additionally, Roblox Corp. only allows a parent to enable parental controls through their minor's account or a linked account. To engage with/change any parental control settings or link a minor's account to theirs, the parent must first know that the account exists, and subsequently know the log in information of their minor, or the minor must enter the parent's email address into their Roblox account.[33]

122.    Until 2024, Roblox Corp. did not provide parental controls for minors' screen time and usage on Roblox. Roblox Corp. could have allowed parent-imposed time limits, but instead chose not to allow parents to set time limits on their minor's Roblox account.

123.    Roblox Corp. could, but does not, allow any users to set self-imposed time limits on their Roblox account.

124.    Further, once a user reaches the age of 13, parents can no longer impose parental controls on their minor's account.[34]

125.    The only Roblox content that is restricted by ID verification is "Restricted content." Though Roblox Corp. has imposed content limits on users under the age of 9, a minor under the age of 9 could easily create an account with a fictitious birth date representing they are over 8 and access most of Roblox's games. Without age verification at account creation and/or to view

---

[33] *Parents: How to Link Your Child's Account*, Roblox, https://en.help.roblox.com/hc/en-us/articles/30428321333140-Parents-How-to-Link-Your-Child-s-Account (last visited July 24, 2025).
[34] *What Happens As I Get Older On Roblox?*, Roblox Support, https://en.help.roblox.com/hc/en-us/articles/30428367965460-What-happens-as-I-get-older-on-Roblox#:~:text=In%20most%20regions%2C%20after%20a,limits%20will%20no%20longer%20apply. (last visited July 24, 2025).

specific content, a minor under 9 can easily bypass Roblox's restrictions.

126.    At account setup, Roblox's website contains no warnings labels, banners, or messaging informing minor users or their guardians of the known risks and harms stemming from the excessive use of Roblox Corp.'s Product. Users are not provided with information regarding potential physical and mental harm associated with compulsive gameplay.

127.    During gameplay, there are no warnings labels, banners, or messaging informing minor users of the known risks and harms stemming from the use of Roblox Corp.'s Product. Users are not provided with information regarding potential physical and mental harm associated with compulsive gameplay.

128.    Roblox Corp., while touting safety as a core value of its company, chooses not to implement meaningful safety features, understanding that changes in parental controls and safety features will reduce time spent in game and, ultimately, revenue.

### D.    Roblox Corp.'s Monetization of Intentionally Addictive Game Design

129.    Roblox Corp. designed the game-creation aspect of its Product to allow users to create their own Roblox video games for play and purchase by other Roblox users, including minors. Though third parties create the games, Roblox Corp. profits from all monetary transactions that occur within these third-party created games.

130.    Roblox Corp. constructed a "Creator Hub" on its website. The Creator Hub provides users with instructions (including "how-to" videos) from Roblox Corp. on how users can create their own Roblox games and also provides users with tools that enable or facilitate creation of their own Roblox games.

131.    Users that create their own games are referred to as "Creators" or "Developers."

132.    Roblox Corp.'s website boasts that its top ten Developers made, on average, $33.9 million in 2024.[35]

---

[35] *Earn on Roblox,* Roblox Creator Hub, https://create.roblox.com/docs/production/earn-on-roblox (last visited July 24, 2025).

133.    Roblox Corp. reports its Developers have been collectively paid $3.3 billion since 2018.[36]

134.    Roblox Corp. encourages creators to incorporate into games the tools that Roblox Corp. created, and makes available within Roblox's game design studio. To assist in teaching current and potential Developers how to utilize Roblox's tools and Roblox Studio, the Roblox Corp.'s Creator Hub includes literature under topics such as: "Publishing," "Promotion," and "Monetization." The Creator Hub's purpose is to teach potential creators "everything [they] need to know about creating on Roblox."[37]

135.    The "Monetization" topic on the Creator Hub includes literature on monetization strategies, immersive ads, subscriptions, passes, developer Products, avatar items, engagement-based payouts, paid access, and private servers.[38]

136.    The Creator Hub discusses "Engagement-Based Payouts," which lets the Developer "earn Robux based on the share of time that Premium members engage in an experience."[39]

137.    Roblox Corp.'s Creator Hub encourages Developers to keep users playing their game(s) for as long as possible to increase the Developer's profits, and in turn, Roblox Corp.'s.

138.    The Creator Hub provides instructions on how Developers can access their "payout data," which will help the Developer "understand what factors drive Premium subscribers to [their] experiences." [40] Analytics on the website provide data and insight to grow a developer's audience.[41]

139.    One of the tools Roblox Corp. created and is featured on Roblox's Creator Hub is a "season pass." As described above, a season pass allows players to pay real-world money to

---

[36] *Id.*
[37] *Creation Overview*, Roblox Creator Hub, https://create.roblox.com/docs/creation (last visited July 24, 2025).
[38] *Monetization*, Roblox Creator Hub, https://create.roblox.com/docs/production/monetization (last visited July 24, 2025).
[39] *Engagement-Based Payouts*, Roblox Creator Hub, https://create.roblox.com/docs/production/monetization/engagement-based-payouts (last visited July 24, 2025).
[40] *Id.*
[41] Roblox Creator Hub, https://create.roblox.com/ (last visited July 24, 2025).

obtain access to exclusive items that are available to be purchased for a limited time through points earned during game play. Roblox Corp.'s Creator Hub encourages the use of season passes to motivate players to continue playing Developers' games, create a sense of urgency regarding items offered for the season, and create anticipation for the next season to keep players coming back.[42]

140.    Roblox Corp. therefore encourages and gives step-by-step instructions for Developers to incorporate Roblox's harmful and addictive algorithms, programming, and strategies, including microtransactions and features without warnings or time restrictions, as described hereafter, into each of their games resulting in Roblox Corp. earning significant profits from each game it helped design, host, and promote on its platform.

141.    Beyond working with developers to create additive games, Roblox Corp. purposefully designed other features within its Product to intentionally addict users.

142.    Roblox Corp. designed an achievement system within Roblox that rewards users for completing various tasks or actions. These achievements are not based upon a user's time or actions within a third-party game "experience," but rather the user's time and actions on Roblox's platform itself. For example, a user playing Roblox can unlock an achievement for playing Roblox for three days in a row, ten days in a row, and twenty days in a row. Likewise, users can earn an achievement for playing Roblox for an hour. When the user unlocks an achievement, they can see what percentage of other users have unlocked the achievement. This system is designed to keep users engaged with the game, incentivize long periods of gaming repeated across multiple days, and ultimately increase Roblox Corp.'s profits.

143.    Roblox Corp. knows its Product incorporates addictive designs that pose risks of causing users to develop dangerous and disordered use and overuse of the Product. In fact, Roblox Corp. developed addictive strategies, game designs, and monetization schemes, implemented them on the Roblox platform itself and then instructed those developing

---

[42] *Season Pass Design*, Roblox Creator Hub. https://create.roblox.com/docs/production/game-design/season-pass-design (last visited July 24, 2025).

"experiences" for its platform to incorporate those addictive features into their games that would be offered to minors. Nonetheless, Roblox Corp. chose to not inform the consuming public at large, users, or guardians of minors who are users, of such risks.

144.    Upon information and belief, Roblox Corp. designed Roblox and the addictive strategies, game designs, and monetization schemes offered in its game and game design studio in conjunction with psychologists, neuroscientists, and other behavioral experts to intentionally maximize the likelihood of addiction of minor and neurodivergent users.

145.    Roblox Corp. admits to consulting child development experts for aspects of game development:[43]

> How is an Age Recommendation determined?
>
> Roblox's age recommendations are grounded in child development research and informed by industry standards. To determine which audiences an experience is generally suitable for, we examined global industry standards and consulted child development experts.

146.    Roblox Corp. actively employs or has employed psychologists and behavioral experts within its People Science and Analytics department and User Experiences department.[44]

147.    The use of operant conditioning, the use of microtransactions within an otherwise free Product, a lack of warnings about the harms of use, no self-imposed limits on playtime, an achievement system that rewards prolonged and repeated gaming sessions, and other features described herein are all examples of Roblox Corp. employing harmful psychological tactics to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, despite Roblox Corp.'s knowledge that abuse and compulsive use of its Product by foreseeable users, *i.e.*, minors and neurodivergent individuals, can and did lead to users, including Plaintiff AJK, suffering impacts on brain

---

[43] Allowed Experience Controls, Roblox, https://en.help.roblox.com/hc/en-us/articles/8863284850196-Allowed-Experiences-Controls (last visited Aug. 28, 2024).
[44] *See, e.g.*, Erica Snow, LINKEDIN, https://www.linkedin.com/in/erica-snow-phd-75272b39 (last visited July 24, 2025); Philip Simmons, LINKEDIN, https://www.linkedin.com/in/philippsimmons (last visited July 24, 2025); Carissa Kang, LINKEDIN, https://www.linkedin.com/in/carissakang (last visited July 24, 2025).

function, addiction, withdrawal symptoms, negative consequences on cognitive processes, and other injuries. Roblox Corp. marketed and misrepresented Roblox as safe for all ages without warning of said risk of injury and addictive design, ultimately helping create and foster an epidemic of video game addiction in minors.

**Fortnite**

### A.    Fortnite Gameplay Basics

148.    Fortnite is an online video game and game platform designed, developed, and published by Epic Games, Inc.

149.    Fortnite is free to play, making it easily accessible to all users, including minors.

150.    Fortnite was first released in 2017 and is now available in three distinct game mode versions that share the same general design and engine.

151.    Fortnite: Battle Royale is a free-to-play battle royale game in which up to 100 users fight in a progressively shrinking arena to be the last person standing. Users can play alone, in a duo, or in a "squad" of 3-4 players. When users land "inside the game," the user must scavenge for weapons, items, resources, and vehicles while trying to stay alive, attack, and eliminate other users. Battle Royale is frequently Fortnite's most popular game and is the game mode to which many attribute Fortnite's success.[45]

152.    Fortnite: Save the World is a cooperative hybrid tower defense-shooter and survival game in which up to four users fight off zombie-like creatures and defend objects with traps and fortifications they can build. Users are awarded a number of in-game items from and during missions, including hero characters, weapon and trap schematics, and survivors, all of which can be leveled up through gained experience to improve their attributes. Save the World is the only pay-to-play game mode of the Fortnite franchise.

153.     Fortnite Creative is a sandbox game mode in which users are given complete freedom to create worlds by spawning any item from Battle Royale on a personal island and can

---

[45] The Week Staff, *What is Fortnite and Why is it So Popular?*, The Week, https://theweek.com/93700/fortnite-battle-royale-news (Aug. 3, 2018).

create games such as battle arenas, racecourses, platforming challenges, and more.

154.    Each of Epic Games' herein listed Fortnite Products has similar game mechanics.

155.    Fortnite has an average of 239 million monthly players and a peak of 15 million players in a day.[46]

156.    Less than two years after Fortnite's release, the games had generated over $9 billion in revenue through microtransactions and in-game purchases. In 2021 alone, Fortnite generated $5.8 billion in revenue.[47]

157.    Fortnite game Products are monetized using V-Bucks: in-game currency that can be purchased with real-world funds or earned through completing missions and other achievements in Save the World.

158.    Fortnite includes a feature called a "Battle Pass," which is identical to the "season pass" feature described above. The Battle Pass in Fortnite allows players to earn various rewards by "levelling up" the Pass. Levelling up can be done by earning medals during gameplay, completing challenges, and purchasing the levels with V-Bucks.[48] The purpose of the Battle Pass is to keep players engaged in hours of gameplay trying to earn rewards, and to increase profits for Epic Games through the purchase of in-game content.

**B.    Fortnite's Youth-Focused Partnerships Contradict Game Rating but Increase Profits**

159.    Fortnite's Battle Royale and Save the World are rated T for Teen, *i.e.,* recommended for individuals aged 13 and above. This does not mean younger children cannot play these games or that Epic Games does not know that children under 13 are using Fortnite

---

[46] This statistic is as of July 2023. *Fortnite Player Count: How Many People Play the Game?* The Econ. Times (Jul. 14, 2023), https://economictimes.indiatimes.com/news/international/us/fortnite-player-count-how-many-people-play-the-game/articleshow/101767141.cms?from=mdr.
[47] Sunil Gill, *Fortnite Revenue, Player Count & Net Worth 2024*, Priori Data (Apr. 1, 2024), https://prioridata.com/data/fortnite-statistics/.
[48] *What is the Battle Pass? Where Can I Learn More?*, Fortnite Support, https://www.epicgames.com/help/en-US/c-Category_Fortnite/c-Fortnite_Gameplay/what-is-the-battle-pass-where-can-i-learn-more-a000084706 (last visited July 24, 2025).

Products. Rather, Epic Games is aware and markets Fortnite to consumers of all ages, and particularly to minors.

160.    Despite its T rating, survey results from 2019 show that 53% of U.S. children aged 10-12 played Fortnite weekly, compared to 33% of U.S. teens aged 13-17.[49]

161.    Even though most Fortnite games are rated T, Fortnite (specifically Battle Royale) has engaged in numerous in-game virtual collaborations with child-friendly entities such as Disney, LEGO, Marvel, NERF, Air Jordan, DC Comics, PAC-MAN, the NFL, Ninja, Rocket League, Ghostbusters, Star Wars, TRON, Neymar Jr., the NBA, LeBron James, Ariana Grande, Naruto, Naomi Osaka, Indiana Jones, Dragon Ball, Spiderman, Batman, TikTok, The Nightmare Before Christmas, Wreck-It Ralph, Lewis Hamilton, Teenage Mutant Ninja Turtles, Nike, Pirates of the Caribbean, and more.[50]

162.    Most, if not all, of these collaborations are geared towards a wide audience that unmistakably includes minors under the age of 13. Many young children watch Disney movies, play with LEGOs, or listen to the music of pop stars like Ariana Grande. Epic Games is explicitly and intentionally marketing its Fortnite games to young children by collaborating with the above entities.

163.    Not only does Epic Games engage in in-game collaborations, but it also has physical merchandise it produces or sponsors, most of which are toys or children's items. For example, Epic Games creates Fortnite themed plastic toy loot boxes and battle boxes, action figures, NERF guns, trading cards, board games, motorized toy cars, LEGO sets, and Halloween costumes. Epic Games has partnered with children's toymakers like Hasbro to create some of these items.

164.    Epic Games knows that young children play Fortnite.

---

[49] National Research Group, *Fortnite: The New Social Media?* (June 4, 2019), *available at* https://assets.ctfassets.net/0o6s67aqvwnu/5z4ja8fNx2NputEG49AVWs/ff1f591ad988f9a30856b ab68e3908bb/NRG_Fortnite_White_Paper.pdf.
[50] Josh Taylor, *Every Single Fortnite Collab & Crossover in Battle Royale's History*, Dexerto (Aug. 26, 2024), https://www.dexerto.com/fortnite/every-fortnite-collab-crossover-battle-royale-history-1645672/.

34

165.    Epic Games organizes its advertisement and collaboration strategies around the interests of young children. And in 2024, Epic Games' projected annual revenue is $5.8 billion.[51] As a result of, in part, its partnership strategies, Epic Games will make a significant portion of that $5.8 billion from young children and their families, while its partnerships further encourage children under 13 to keep using its Products.

### C.    Fortnite was Designed with Intentionally Addictive Features

166.    Epic Games knows that minors and those who are susceptible to addiction are using its Product, but nonetheless chose to add features to its Product to intentionally addict such users.

167.    Epic Games actively employs or has employed psychologists and behavioral experts within its User Experiences department and Online department.[52]

168.    Upon information and belief, Epic Games designed Fortnite in conjunction with psychologists and other behavioral experts to intentionally maximize the likelihood of addiction of minor and neurodivergent users.

169.    Epic Games utilizes countless strategies to intentionally maximize the likelihood of addiction of its users. For example, Epic Games designed an achievement system within Fortnite that rewards users for completing various tasks or actions. One such achievement is earned when a user saves 10,000 survivors in successful missions. Another such achievement is unlocked when a user completes 1,000 missions. When the user unlocks an achievement, they can see what percentage of other users have unlocked the achievement. Many achievements are difficult to obtain and require hundreds of hours of gameplay to unlock. This system is designed to keep users engaged with the game, incentivize long periods of gaming over many days, and ultimately

---

[51] Josh Howarth, *Fortnite User and Growth Stats 2024*, Exploding Topics (Jul. 22, 2024), https://explodingtopics.com/blog/fortnite-stats.

[52] *See, e.g.*, Ben Taels, LINKEDIN, https://www.linkedin.com/in/ben-taels-06913a15 (last visited July 24, 2025); Celia Hodent, LINKEDIN, https://www.linkedin.com/in/celiahodent (last visited July 24, 2025); *Video Games, Psychology, and the User Experience with Dr. Celia Hodent (Epic Games)*, NC State University Libraries, https://www.lib.ncsu.edu/events/video-games-psychology-and-user-experience-dr-celia-hodent-epic-games#:~:text=Video%20Games%2C%20Psychology%2C%20and%20the,Games)%20%7C%20NC%20State%20University%20Libraries (Feb. 2, 2016); Katelyn Procci, LINKEDIN, https://www.linkedin.com/in/katelynprocci (last visited July 24, 2025).

increase Epic Games' profits.

170.    Likewise, as noted above, Epic Games designed a Battle Pass system that is designed to encourage players to continually play in order to earn various time-limited in-game rewards and cosmetics by obtaining points through the completion of increasingly difficult challenges across repeated hours and sessions of gameplay or by spending real-world money through V-Bucks.

171.    These addictive features found within Fortnite are intentionally designed and placed within the game to encourage continued and compulsive use, furthering user addiction.

**D.      <u>Epic Games Deceptively Promises Safety and Educational Value in Fortnite</u>**

172.    Epic Games assures users that it wants its Product to be a "safe . . . place for [users] to play games."[53]

173.    Epic Games does not disclose to the public or the users of Fortnite any of the psychological tactics or addictive features it purposefully incorporates into its Product. Instead, Epic Games touts Fortnite as "educational" and markets it for use in school classrooms.

174.    On its website, Epic Games even offers "Free Fortnite lesson plans" to educators on subjects ranging from history, geography, and programming:[54]



---

[53] *Epic Games: Community Rules*, Epic Games, https://www.epicgames.com/site/en-US/community-rules (last visited July 24, 2025).
[54] *Education*, Epic Games, https://dev.epicgames.com/documentation/en-us/fortnite-creative/education-in-fortnite-creative (last visited Apr. 8, 2025).

175. Epic Games joined the Family Online Safety Institute ("FOSI") in 2023, stating it wants to "support [FOSI's] work to keep kids safe online." Epic Games's Senior Director of Public Policy represents Epic Games wants to "be on the forefront of creating fun and safe games and experiences for people of all ages," emphasizing its alleged focus on the importance of safety for children playing its games, including Fortnite.[55]

176. Despite assurances of safety, the addictive properties and design features, as alleged herein, of Fortnite are so dangerous to users, and especially minors, that several health and behavioral centers across the country have published resources for parents specifically warning about Fortnite addiction.[56] Many health experts have concluded that Fortnite can be as addictive as heroin and other illegal drugs.[57]

177. Despite these third-party warnings of the dangers of Fortnite, Epic Games has failed to disclose the risks of harm purposefully built into Fortnite, and has failed to protect minor users using its Product. While Fortnite does feature some parental controls, they are grossly deficient. Although minor accounts automatically restrict some in-game communication, there is no age verification process. If a minor who is under 13 wants to sign up with a fictitious birth date, they can, and can play Fortnite without the restrictions of an account where the user represents they are under 13.

178. Fortnite could, but chooses not to, require express parental consent for minors under 13 to create an account. If a minor under 13 creates an account, they can still access most game content and purchase items.

179. Fortnite imposes a daily spending limit on minors under 13, however, that limit is

---

[55] *Epic Games Joins the Family Online Safety Institute,* FOSI (Nov. 28, 2023), https://www.fosi.org/about-press/epic-games-joins-the-family-online-safety-institute.
[56] Rachel Ehmke, *A Parent's Guide to Dealing With Fortnite*, Child Mind Institute, https://childmind.org/article/parents-guide-dealing-fortnite/ (last visited Aug. 26, 2024).
[57] *Health Experts: Video Game "Fortnite" Can Be Addictive As Heroin*, KRON ABC 8 News (Sep. 29, 2018), https://www.wric.com/news/whats-trending/health-experts-video-game-fortnite-can-be-addictive-as-heroin/.

$100 per *day*.[58] A minor under 13 could spend $36,500 on Fortnite in a year without any parental consent or permission.

180.    While Fortnite imposes *some* automatic restrictions on minors' accounts if the user is under 13, the parental controls and restrictions can only be accessed via the minor's account. To engage with/change any parental control settings, the parent must first know that the account exists, and subsequently know the log in information of their minor.

181.    Epic Games does not provide parental controls regarding screen time, gameplay, and/or usage. Epic Games could, but chooses not to, allow parents to set time limits on their minor's Fortnite account. Epic Games also could, but does not, allow users to set self-imposed time limits on their Fortnite account.

182.    At account setup, Fortnite's website contains no warnings labels, banners, or messaging informing minor users or their guardians of the known risks and harms stemming from the excessive use of Epic Games' Product. Users are not provided with information regarding potential physical and mental harm associated with gameplay.

183.    During gameplay, there are no warnings labels, banners, or messaging informing minor users or their guardians of the known risks and harms stemming from the use of Epic Games' Product. Users are not provided with information regarding potential physical and mental harm associated with gameplay.

184.    Epic Games designed and developed Fortnite games with the use of addictive operant conditioning to make users want to keep using the Product more and more.

185.    The team that developed Fortnite includes psychologists, statisticians, analysts, and coordinators who worked for nearly four years to develop a Product that was as addictive as possible.

---

[58] Daily Spending Limits For Players Under 13, Epic Games, https://www.epicgames.com/help/en-US/c-Category_EpicAccount/c-EpicAccounts_ParentalControls/daily-spending-limits-for-players-under-13-a000085524 (last visited July 24, 2025).

186. Upon information and belief, Epic Games has licensed patented addictive technologies from other video game developers and publishers to include additional addictive features in Fortnite.

187. Engaging and addicting users who are minors early and in environments such as their classroom increases Epic Games' revenue through continued use of Fortnite by young users, at the expense of these users' mental and physical health.

188. Epic Games knew that its Fortnite Product contained an inherent risk of abuse, addiction and compulsive use by minors and the harms that arise therefrom, but instead of disclosing such harms, Epic Games marketed Fortnite as "educational" and safe for use by minors (inside and outside the classroom).

189. The use of operant conditioning, the use of microtransactions within an otherwise free Product, a lack of warnings about the harms of use, no self-imposed limits on playtime, an achievement system that rewards prolonged and repeated gaming sessions, and other features described herein are all examples of Epic Games designing Fortnite with harmful psychological tactics to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) and to create addictive engagement, despite Epic Games' knowledge that abuse and compulsive use of its Product by foreseeable users, *i.e.*, minors and neurodivergent individuals, can and did lead to users, including Plaintiff AJK, suffering impacts on brain function, addiction, withdrawal symptoms, negative consequences on cognitive processes, and other injuries. Epic Games marketed and misrepresented Fortnite as safe for all ages without warning of said risk of injury and addictive design, ultimately helping create and foster an epidemic of video game addiction in minors.

## Minecraft

### A.    Mojang and Microsoft Design, Develop, and Market Minecraft

190. Minecraft was first developed and released by Mojang AB in November 2011.

191. In September 2014, Microsoft Corporation acquired Mojang AB and its intellectual property (including Minecraft).

192.    After its acquisition of Mojang, Microsoft has been directly and actively involved with Mojang in the design, development, testing, production, manufacture, labeling, marketing, advertising, promotion, supply, sale, and distribution of Minecraft. Indeed, since acquiring Mojang, Microsoft has overseen over 125 updates to Minecraft.

193.    To date, over 300 million copies of Minecraft have been sold,[59] and the game averages around 200 million players per month.[60]

**B.    Minecraft Gameplay Basics**

194.    Minecraft is a 3D sandbox game that can be played on a PC, various gaming consoles including Xbox, and mobile devices.

195.    Minecraft's visual design is simple, using blocky, pixelated graphics, and basic colors.

196.    The game itself is easy for users to learn and understand. Gameplay involves the user's character collecting resources, exploring the Minecraft world, crafting items, and trying to survive. The Minecraft world is virtually infinite and is generated based on the user's exploration.

197.    There are multiple game modes, including survival mode and creative mode. Users in survival mode must gather resources to build structures and maintain their health while avoiding attacks from monsters known as "mobs." Users in creative mode have access to unlimited resources they can use to craft items or create structures. Within the creative game mode, the user cannot get hurt by attacking "mobs." Each game mode offers slightly different building abilities and access to resources.

---

[59] Britney Nguyen, *Minecraft Just Surpassed 300 Million Sales–Here's The Only Video Game Still Beating It*, Forbes (Oct. 16, 2023), https://www.forbes.com/sites/britneynguyen/2023/10/16/minecraft-just-surpassed-300-million-sales-heres-the-only-video-game-still-beating-it/#:~:text=Minecraft%20has%20reached%20over%20300,Minecraft%20Live%202023%20this%20weekend..
[60] Spencer Whitworth, *Minecraft Live Player Count (September 2024)*, Sportskeeda (Apr. 1, 2025), https://www.sportskeeda.com/minecraft/minecraft-live-player-count.

198. Minecraft users are encouraged to join different "worlds," which can include multiplayer or single-player worlds depending on what kind of world the user enters. To generate a world to play in, users utilize "seeds" which are essentially computer codes. Once a player enters a seed, the code creates a world for the user to explore. The seed shapes the landscape of the world.

199. The exact structures of most worlds are unique to that world, but worlds created with the same seed will be identical. Users can share seeds with friends so the friends can create the same world using that seed.

200. Mojang and Microsoft designed Minecraft with multiplayer options, allowing players to interact and communicate with each other in the game world.

201. There are different versions of Minecraft available for play depending on the platform used. The original version of Minecraft, now called "Minecraft Java," is available for play on a PC. The most popular version of Minecraft, and the version available on most platforms, is called "Minecraft Bedrock." Minecraft Java and Minecraft Bedrock are similar; however, the Bedrock version is still currently updated and has additional features that Minecraft Java does not have.

202. In order to play Minecraft, users must purchase the game and create a Minecraft account.

203. To create a Minecraft account, users must input a pre-existing Microsoft account, or create a Microsoft account, and choose a password. Users of any age can create a Minecraft account. There is no age verification upon sign-up on the Minecraft website.

204. Minecraft has its own form of currency called "Minecoins." One Minecoin is worth less than one US dollar. Minecoins can only be purchased with real currency.

205. Minecoins can be used to purchase various in-game features such as new skins for the user's avatar, "texture packs" that change the appearance of building blocks within the game,

"mash-up packs" that allow users to enter themed worlds with special textures and skins, mini games, and access to new adventures via adventure maps.[61]

206. In addition to the base game, users can purchase a "Marketplace Pass" for $3.99 per month. The Pass allows subscribers to "[p]lay 150+ pieces of exciting content,…dive into worlds, mash-ups, skins packs, texture packs, and more." New content is added every month to the Pass.[62]

207. Users can also purchase a "Realms Subscription" which allows them to run their own Minecraft server and share their Marketplace Pass items with up to 10 friends. A Realms Subscription starts at $3.99 per month.

208. In 2024, Minecraft brought Microsoft and Mojang approximately $220 million in revenue.[63]

C. **Minecraft Markets to Young Children to Increase Profits**

209. Minecraft is rated as safe for children 10 and older by the Entertainment Software Rating Board ("ESRB"), which is the leading game-rating system for games in the United States.

210. Nonetheless, Microsoft and Mojang know that much of Minecraft's player base is younger than 10.

211. Studies have shown that approximately 53% of children aged 6 to 8 and 68% of children aged 9 to 12 play Minecraft.[64]

212. Despite Minecraft's age rating, Minecraft has engaged in numerous in-game virtual and physical product collaborations with child-friendly entities such as LEGO, Avengers, Guardians of the Galaxy, Spiderman, Moana, Star Wars, Sonic the Hedgehog, Super Smash

---

[61] *Minecraft Marketplace*, Minecraft, https://www.minecraft.net/en-us/marketplace (last visited July 24, 2025).
[62] *Minecraft Marketplace Pass*, Minecraft, https://www.minecraft.net/en-us/marketplace/marketplace-pass (last visited July 24, 2025).
[63] David Curry, *Minecraft Revenue and Usage Statistics (2024)*, Bus. of Apps (Jan. 10, 2024), https://www.businessofapps.com/data/minecraft-statistics/.
[64] Jane Mavoa & Marcus Carter, *Minecraft Teaches Kids About Tech, But There's A Gender Imbalance At Play*, The Conversation (Jan. 16, 2018), https://theconversation.com/minecraft-teaches-kids-about-tech-but-theres-a-gender-imbalance-at-play-89496.

Bros., The Incredibles, Angry Birds, Frozen, Ice Age, Sponge Bob Square Pants, Toy Story, Minions, Power Rangers, Fortnite, and more.[65]

213.    Most, if not all, of these collaborations are geared towards a wide audience that unmistakably includes minors under the age of 10. Many young children watch Disney movies or play with LEGOs or Hot Wheels. Microsoft and Mojang explicitly and intentionally market Minecraft to young children by collaborating with the above entities.

214.    In addition to virtual collaborations, Microsoft and Mojang also have physical Minecraft merchandise they produce or sponsor, most of which are toys or children's items. For example, Microsoft and Mojang have created a kids educational touchscreen smart watch; an LED lamp that looks like a Minecraft torch; a glitter motion light; plush toys based on Minecraft characters; Minecraft themed LEGO sets, action figures, board games, and Hot Wheels; foam weapons; clothing; pajamas; and Halloween costumes. Minecraft also has a line of books for children as young as five that are intended to teach children how to read.

215.    Microsoft and Mojang organize their advertisement and collaboration strategies around the interests of young children and make a significant portion of their revenue from young children and their families.

D. **Microsoft and Mojang Deceptively Promise Safety and Educational Value in Minecraft**

216.    Microsoft and Mojang do not inform users of the inherent risk of addiction involved with using and playing Minecraft or that the Product was designed to make users play more to their potential harm.

217.    Instead, Minecraft's website provides users, potential users, and guardians with false assurances of safety. For example, Microsoft and Mojang state that:

---

[65] *Category: Collaborations*, Minecraft Wiki, https://minecraft.wiki/w/Category:Collaborations (last visited July 24, 2025).

a.   they "hold [them]selves accountable for making Minecraft as safe as possible for everyone."[66]

b.   it is "so important that [their] games are a safe and welcoming place for all players."[67]

c.   "player safety is a priority for Mojang to ensure everyone feels safe."[68]

d.   their "community standards help [them] build a community that is open and safe for everyone."[69]

218.   Minecraft does feature some parental controls, but they are grossly deficient. While minor accounts for children younger than 16 are automatically created with some restrictions on in-game communications and other features, there is no age verification process. If a minor who is under 16 wants to create a Minecraft account with a fictitious birth date, they can, and can then create an account and play Minecraft without the restrictions of an account where a user represents they are under 16.

219.   Microsoft and Mojang could, but choose not to, require express parental consent for minors under 16 to create an account. If a minor under 16 creates an account, they can still access almost all game content and purchase items. There is no daily spending limit automatically imposed on any minor accounts.

220.   Guardians can access parental controls to change the automatic restrictions set by Microsoft and Mojang if their minor is under 16, however, such features are only available if a parent creates their own account and links it to the minor's account. To engage with/change any parental control settings, the parent must first know the account exists, and subsequently know the gamertag information to link their account to their minor's account.

---

[66] *Minecraft Help Center – General Safety*, Minecraft, https://help.minecraft.net/hc/en-us/articles/8047895358605 (last visited July 24, 2025).
[67] *Id.*
[68] *Community Standards for Minecraft*, Minecraft, https://www.minecraft.net/en-us/community-standards (last visited July 24, 2025).
[69] *Minecraft End(er)-User License Agreement ("EULA")*, Minecraft, https://www.minecraft.net/en-us/eula (last visited Apr. 8, 2025).

221. Microsoft and Mojang do not provide parental controls within Minecraft regarding screen time, gameplay, and/or usage. Microsoft and Mojang could, but choose not to, allow parents to set time limits on their minor's Minecraft account. Microsoft and Mojang also could, but do not, allow any users to set self-imposed time limits on their Minecraft account.

222. At account setup, Minecraft's website contains no warnings labels, banners, or messaging informing minor users of the known risks and harms stemming from excessive use of Microsoft and Mojang's Product. Users, or those linked to a minor's account as the user's guardian, are not provided with information regarding potential physical and mental harm associated with gameplay.

223. During gameplay, there are no warnings labels, banners, or messaging informing minor users or their guardians of the known risks and harms stemming from the use of Microsoft and Mojang's Product. Users, or those linked to a minor's account as the user's guardian, are not provided with information regarding potential physical and mental harm associated with gameplay.

224. Microsoft and Mojang do not inform, users of the inherent risks involved with using Minecraft, specifically excluding that Minecraft was designed to addict users to their extreme harm and detriment.

225. Microsoft and Mojang do not disclose to the public or users of Minecraft any of the psychological tactics or addictive features they purposefully incorporate into their Product. Instead, Microsoft and Mojang tout their Minecraft game as educational and have developed Minecraft: Education Edition for use in the classroom.

226. Minecraft: Education Edition ("Minecraft Education") is a game-based learning platform. Minecraft Education uses the Minecraft graphics with "features built specifically for

learning environments." It includes over "600 standards-aligned lessons,"[70] and includes coursework across various subjects.[71]

227.    Though Minecraft's age-rating is for children 10 and older, Minecraft Education has lesson plans for children as young as 5,[72] and encourages school leaders, educators, and parents to use Minecraft. Minecraft Education provides resources so educators can "learn to teach with Minecraft."[73]



228.    The use of Minecraft Education introduces children to the game that are years younger than Minecraft's age rating.

### E.    Minecraft was Designed with Intentionally Addictive Features

229.    Microsoft and Mojang know that minors and those who are susceptible to addiction are using their Product, but nonetheless chose to add features to Minecraft to intentionally addict such users.

230.    Upon information and belief, Microsoft and Mojang actively employ or have employed psychologists and behavioral experts to work on Minecraft development.

---

[70] *What is Minecraft Education?*, Minecraft Education, https://education.minecraft.net/en-us/discover/what-is-minecraft (last visited July 24, 2025).
[71] *Minecraft Education For Educators: Get Started*, Minecraft Education, https://education.minecraft.net/en-us/get-started/educators (last visited July 24, 2025).
[72] Minecraft's own website states "[s]oon students from kindergarten to graduation can utilize Minecraft Education." *Back to School Preview: Make it Minecraft!*, Minecraft Education (Apr. 8, 2025), https://education.minecraft.net/en-us/blog/back-school-preview-make-it-minecraft.
[73] *Minecraft Education For Educators: Get Started*, Minecraft Education, https://education.minecraft.net/en-us/get-started/educators (last visited Apr. 8, 2025).

231. Upon information and belief, Microsoft and Mojang designed Minecraft in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users.

232. Upon information and belief, Microsoft and Mojang have licensed patented addictive technologies from other video game developers and publishers to include additional addictive features in the Minecraft Product.

233. One example of an intentionally addictive feature within Minecraft is a specific in-game reward system known as "advancements" or "achievements" created by Microsoft and Mojang in order to incentivize players to engage in repeated and prolonged sessions playing Minecraft.

234. In Minecraft Java, when a user completes a specific action or "advancement," they receive a number of "Experience Orbs" or "EXP" or "XP," which are used like a currency to enhance user's in-game equipment and reach new levels of the game. XP is gained by performing specific tasks, like successfully defending a village from a raid or killing a hostile monster:[74]



235. When a user obtains enough XP, they can "level up," meaning the user's character advances to a higher level, becomes more powerful, and gains access to new talents and equipment.[75]

---

[74] *Advancement*, Minecraft Wiki, https://minecraft.fandom.com/wiki/Advancement (last visited July 24, 2025).
[75] *How to Earn Experience Points & Level Up in Minecraft*, (Jan. 24, 2022), https://www.dummies.com/article/home-auto-hobbies/games/online-games/minecraft/how-to-earn-experience-points-and-level-up-210066/.

236. In Minecraft Bedrock, when a user completes a specific action or task, they receive an achievement or trophy. The achievement is then logged in the player's Minecraft account. Most achievements provide in-game rewards such as creator items or emotes when unlocked.

237. Not all advancements and achievements are equally easy to obtain. Instead, Microsoft and Mojang have intentionally created advancements and achievements that incentivize many hours and/or days of gameplay. By way of example, Microsoft and Mojang chose to reward players for playing Minecraft for 100 days, playing underwater for 10 minutes, building maps from pieces hidden throughout the game, trading 1,000 emeralds, collecting a surplus of resources, and more. These achievements can take countless hours across many days to unlock due to the complexity and/or time-consuming nature of the steps needed to unlock the achievement.

238. This reward system creates addictive engagement and encourages players to continue gameplay.

239. Many items within Minecraft are statistically more or less difficult to find based upon the item's rarity. Upon information and belief, Microsoft and Mojang intentionally include algorithms that randomize the possibility of finding specific items within the game, and can adjust those algorithms at any time. Microsoft and Mojang can and do manipulate the odds that a user will be able to locate a desired item, thereby artificially increasing the amount of time a player must spend in-game to obtain that item, regardless of the player's skill level. Microsoft and Mojang use these algorithms and features to make the game more difficult, as players cannot automatically locate many in-game items. This creates further addictive engagement and increases gameplay as players search for what they need.

240. Microsoft and Mojang knew that its Minecraft Product contained an inherent risk of abuse, addiction, and compulsive use by minors and the harms that arise therefrom, but instead of disclosing such harms Microsoft and Mojang marketed and misrepresented Minecraft as "educational" and safe for use by minors.

241. The use of operant conditioning, a lack of warnings about the harms of use, no option for self-imposed limits on playtime, an achievement system that rewards prolonged and repeated gaming sessions, and other features described herein are all examples of Microsoft and Mojang designing Minecraft with harmful psychological tactics to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, despite Microsoft and Mojang's knowledge that abuse and compulsive use of its Product by foreseeable users, *i.e.*, minors and neurodivergent individuals, can and did lead to users, including Plaintiff AJK, suffering from impacts on brain function, addiction, withdrawal symptoms, negative consequences on cognitive processes, and other injuries. Microsoft and Mojang marketed and misrepresented Minecraft as safe for all ages without warning of said risk of injury and addictive design, ultimately helping create and foster an epidemic of video game addiction in minors.

**Microsoft's Xbox and Xbox Products**

### A. <u>Xbox Product Basics</u>

242. Xbox is a video gaming brand, owned and operated by Microsoft, which consists of Xbox gaming consoles, as well as online video gaming through the Xbox network, Xbox Game Pass, and Xbox Cloud Gaming.

243. Each version of the Xbox console provides users with the ability to play video games using a hard copy of the video game (typically in a disc format), a digital copy downloaded from the Microsoft Store (also known as Xbox Games Store, hereinafter "Xbox Store"), using the Xbox Network (formerly known as Xbox Live), and/or using Xbox Game Pass or Cloud Gaming.

244. Microsoft developed and maintains the Xbox Store – a product-platform through which users can purchase thousands of games to be stored on their console through digital download, and for use with its Xbox consoles.

245. Though third parties create many of the games available in the Xbox Store, Microsoft profits from all monetary transactions that occur within the store, taking thirty percent of revenue from sales of third-party console games.[76]

246. Likewise, Microsoft profits from all monetary transactions that occur within the third-party games played on its Xbox Platform.

247. Microsoft markets the Xbox Store as "safer for the whole family" to use:



248. Microsoft also touts that:

   a. "Xbox strives to create a safer gaming experience for you and your family."[77]

   b. "[Xbox holds itself] accountable for making our platforms as safe as possible for all players."[78]

   c. "[Xbox] will promote the availability of our safety tools through our platforms, support channels, services, on our websites and in retail stores to reach more players and parents."[79]

---

[76] Tom Warren, *Microsoft Explored Reducing its Xbox Store Cut to Shake Up Console Gaming*, The Verge (Mar. 2, 2021), https://www.theverge.com/2021/5/2/22415712/microsoft-xbox-store-cut-epic-games-court-documents.

[77] *Family-Friendly Gaming for Everyone*, Xbox, https://www.xbox.com/en-US/family-hub#:~:text=FAMILY%2DFRIENDLY%20GAMING%20FOR%20EVERYONE&text=Xbox%20strives%20to%20create%20a,Windows%2C%20and%20Xbox%20mobile%20apps (last visited July 24, 2025).

[78] Dave McCarthy, *Our Shared Commitment to Safer Gaming*, Xbox, Dec. 14, 2020, https://www.xbox.com/en-US/family-hub/safety-principles.

[79] *Id.*

249.    The Xbox Network is an online multiplayer gaming service created and operated by Microsoft for use with its Xbox consoles. The Xbox Network includes the Xbox Store and Xbox Cloud Gaming.

250.    Xbox Cloud Gaming or Game Pass is operated by linking a device, either a console, tablet, phone, or computer, to a remote server in the cloud. Gameplay is saved in the cloud and can be accessed and used from numerous devices at any given location. Thousands of games are available in the Xbox Cloud Gaming and Xbox Network library, including Roblox, Fortnite, and Minecraft.

**B.    Microsoft Employs a Game-Like Achievement System On Its Platforms that Causes and/or Exacerbates Compulsive Game Use.**

251.    Microsoft knows that games targeted to minors, such as those at issue here – Roblox, Fortnite, and Minecraft – are available on its Xbox Platform. To be sure, Microsoft markets and sells "Minecraft Edition" Xbox consoles, and both Roblox and Fortnite Xbox "bundles," whereby consumers can purchase the Products contemporaneously. Microsoft is therefore aware that minors and those who are susceptible to addiction are using its Xbox Platform. Nonetheless, Microsoft chose to add features to its Xbox Platform that intentionally addict such users.

252.    Microsoft actively employs or has employed psychologists and neuroscientists within its Xbox User Research and Xbox Player Experiences & Platform departments.[80]

253.    Upon information and belief, through the use of such psychologists and neuroscientists, Microsoft developed and implemented design features to keep users compulsively and addictively engaged with its platform, despite its knowledge that abuse,

---

[80] *See* Deborah Hendersen, LINKEDIN, https://www.linkedin.com/in/deborahjohendersen (last visited July 24, 2025); Todd Kelley, LINKEDIN, https://www.linkedin.com/in/toddakelley (last visited July 24, 2025); Carolina Labbé, LINKEDIN, https://cl.linkedin.com/in/carolinalabbe (last visited July 24, 2025); Emily Joseph, LINKEDIN, https://www.linkedin.com/in/emilymjoseph1?trk=public_post_feed-actor-name (last July 24, 2025).

addiction, and compulsive use by minors can lead to impacts on brain function and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

254. For example, within its Xbox Products, Microsoft developed and implemented a program called the Xbox achievement system ("Xbox achievements" or "achievements"). Xbox achievements is a game-like program that tracks the amount of time a player spends in games on the Xbox platform and the player's actions within those games.

255. Microsoft encourages game developers to use its achievement system by creating tasks for players to accomplish within their respective games.

256. Microsoft makes available to all users the achievements that are available within the games they are playing.

257. Many of the achievements created within Microsoft's achievement system are met by players spending excessive time in-game. For example, a player can earn the Minecraft "Passing the Time" achievement by playing Minecraft on Xbox for 100 days. Likewise, Roblox achievements include "Marathon" for playing Roblox for an hour, "3 Day Roll" for playing Roblox three days in a row, "10 Day Roll" for playing Roblox ten days in a row, and "20 Day Roll" for playing Roblox 20 days in a row. Similarly, Fortnite includes the "Talented Builder" achievement for building 500,000 structures within the game.

258. Within each user's Xbox profile, an "achievements" tab displays each game where the user has obtained an achievement. Within the achievements tab, each game shows the percentage of other players who have unlocked the same achievement, and the date it was unlocked:

 

259.    If a user has their Xbox Platform on, but fails to engage with it for a length of time, Microsoft displays a screensaver that highlights a user's progress in unlocking achievements within a third-party's game.

260.    When these achievements are earned, *Microsoft* – not the third-party games – notifies the player with a console based – not game based – message. This console-based message is akin to the lights and sounds of a slot machine in a casino. Microsoft plays a reward-signifying noise and displays a bright message on the screen highlighting the player's accomplishment:



261.    Xbox achievements are categorized as either standard achievements or rare achievements. When a rare achievement is unlocked, the graphic displayed on the user's screen

in-game indicates that the achievement is rare. A rare achievement is one that less than 10% of users have unlocked.

262.    In addition to such messages, Microsoft awards players a "Gamerscore" for each achievement earned. In game-like fashion, Microsoft tabulates each player's Gamerscore for the achievements earned across all games played on the Xbox platform and displays that score for all other users to see.

263.    While Xbox achievements earned and a player's Gamerscore can be an indication to other users and friends about how much and how well a user has played, Microsoft's purpose for implementing Xbox achievements goes beyond the social aspects of gaming. Rather, Microsoft created the Xbox achievement system in order to incentivize extended and continued gameplay on its platform, resulting in more purchases of in-game or of third-party games, all of which increase Microsoft's profits.

264.    Microsoft's Platform does not contain any warnings about the general harmful nature of its achievement system or general gaming addiction. At account setup, the Xbox website contains no warnings labels, banners, or messaging informing minor users of the known risks and harms stemming from the use of the Xbox platform. Users are not provided with information regarding potential physical and mental harm associated with use of the platform, including stress, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders at account setup or at any time during usage. Users are not provided with information regarding potential physical and mental harm associated with the use of its platform.

265.    Microsoft could, but chooses not to, provide warnings about the harms of use of its platform without any changes to the achievement system or the content of the achievements.

266.    Microsoft could, but chooses not to, implement user protections or safeguards, such as user-imposed time limits on gameplay, increased age verification at account setup, and automatic parental controls imposed when a minor creates an Xbox account.

C.       **Microsoft's Xbox Products Do Not Include Adequate Parental Controls**

267.    To make an Xbox profile, users must first create a Microsoft account, or link to a pre-existing Microsoft account.

268.    If a user already has a Microsoft account, no age verification is required to create an Xbox profile.

269.    Most parental controls are not automatically applied to a minor's Xbox profile upon creation. A parent or guardian can only implement parental controls by accessing the console itself and adjusting settings to apply controls, by logging into the Xbox profile wherein they want to impose parental controls, or by connecting their child's account to their own Microsoft profile. To engage with/change any parental control settings, the parent must first know the account exists, and subsequently know the child's gamertag information to implement controls on their minor's account.

270.    Microsoft could, but chooses not to, automatically implement all parental controls on minors' Xbox profiles upon creation.

271.    The use of operant conditioning, a lack of warnings about the harms of use, an achievement system that rewards prolonged and repeated gaming sessions, and other features described herein are all examples of Microsoft designing Xbox Products with harmful psychological tactics to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, despite Microsoft's knowledge that abuse and compulsive use of its Product by foreseeable users, *i.e.*, minors and neurodivergent individuals, can and did lead to users, including Plaintiff AJK, suffering impacts on brain function, addiction, withdrawal symptoms, negative consequences on cognitive processes, and other injuries. Microsoft marketed and misrepresented Xbox Products as safe for all ages without warning of said risk of injury and addictive design, ultimately helping create and foster an epidemic of video game addiction in minors.

**PLAINTIFF-SPECIFIC ALLEGATIONS**

272.    Plaintiff AJK has been injured and harmed as a direct and proximate result of each Defendant's actions and misconduct, and for that, they are entitled to compensation and other damages under the law.

273.    AJK's gaming addiction is a substantial factor in the decline of AJK's success in school, affecting not only their academic performance, but also their relationship with peers. AJK often plays Defendants' games late into the night, and sometimes even until 2:00 a.m. to 4:00 a.m. before having to attend school that day. AJK's compulsive and disordered use of Defendants' Products has resulted in exhaustion, falling asleep during classes, failure to concentrate on tasks and assignments, and an inability to keep up with coursework. Plaintiff was held back in school and required the implementation of an IEP to assist with their academic progress, on information and belief due at least in part to their compulsive gaming use.

274.    Moreover, rather than engaging in activities with family or friends, AJK only seeks to live in the world offered by Defendants' Products, and any attempt to remove AJK from their games is met with severe withdrawal symptoms including anger, aggression, tantrums, and crying.

275.    Each Defendant has engaged in deceptive, unfair, immoral, and reckless behavior that damaged and continues to harm Plaintiff AJK and countless other Pennsylvanians and Americans. For this, they should be punished, and punitive damages should be assessed against each Defendant for their respective misdeeds and unlawful conduct.

276.    AJK never agreed to be harmed or exposed to an addictive Product. Plaintiff AJK also never entered into a contract with any of the Defendants, and/or to the extent that any Defendant claims a contract exists with AJK, AJK expressly disaffirms said alleged contract.

**PLAINTIFF'S CLAIMS**

**COUNT I – NEGLIGENCE (BREACH OF SPECIAL RELATIONSHIP DUTY)**

**(Against Defendants Roblox, Epic Games, Mojang AB, Microsoft and DOES 1-50)**

277.    Plaintiff AJK realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

278.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, distributing, and/or providing access to their respective video game Products and environments to users throughout the United States, including to Plaintiff AJK.

279.    A defendant owes an affirmative duty to protect when a special relationship exists between the defendant and the plaintiff. Such relationships are characterized by dependency and vulnerability on one side and control over the means of protection on the other.

280.    A special relationship exists between each Defendant and its minor users, including AJK, as alleged more fully in Section IV of the General Factual Allegations, which allegations are incorporated herein.

281.    Minor users of Defendants' Products are particularly vulnerable and dependent on Defendants for protection due to minors' developing brains and their susceptibility to the addictive design features incorporated into Defendants' Products. Once inside Defendants' digital environments, minors cannot protect themselves from the addictive design features, algorithms, and psychological techniques deployed against them.

282.    Each Defendant exercises comprehensive control over its digital environment, including control over what content minors can access, what communications minors can send and receive, what features and design elements minors encounter, what data is collected about minors' behavior, and what safety measures are implemented.

283.    Each Defendant's relationship with its minor users is precisely bounded. Each Defendant requires account creation, collects age information, categorizes users by age, and

applies differentiated restrictions to identified minor users. AJK was among those identifiable, registered minor users.

284.   Minor users and their parents have a reasonable expectation, fostered by Defendants themselves, that Defendants will exercise reasonable care to protect minors from foreseeable harm. Defendants cultivated this expectation through the public representations about safety alleged herein.

285.   Each Defendant derives substantial benefit from its relationship with minor users through in-game purchases, extended engagement, and monetization metrics.

286.   By virtue of this special relationship, each Defendant owed AJK an affirmative duty to exercise reasonable care to protect AJK from foreseeable harm arising from the use of Defendants' video game Products, including the foreseeable harm of excessive, compulsive, and addictive use.

287.   Each Defendant breached its duty of care by failing to exercise reasonable care to protect AJK from the foreseeable harms of excessive gaming. Each Defendant's breaches include, but are not limited to:

a.   Failing to implement adequate age verification;

b.   Failing to implement effective, automatically applied parental controls;

c.   Failing to remove barriers to the enactment of parental controls;

d.   Failing to warn minor users and their parents of the known health risks of excessive use;

e.   Failing to provide opt-in or automatic restrictions on the length and frequency of gameplay sessions;

f.   Failing to provide self-limiting tools, including session time notifications, warnings, or usage reports;

g.   Failing to provide tools to restrict or block usage during certain times of day;

h.   Failing to provide self-imposed limits for microtransactions;

i.    Failing to monitor for and intervene when minor users' engagement patterns indicated harmful excessive use, despite possessing the data and technical capability to do so; and

j.    Instead, affirmatively designing their video game Products so as to maximize addictive and compulsive use by minor users.

288.    A reasonable company under the same or similar circumstances would have exercised reasonable care to protect identified minor users from foreseeable harm.

289.    Each Defendant's breach of its special relationship duty was a substantial factor in causing harm to AJK and is the actual and proximate cause of said harm.

290.    As a direct and proximate result of each Defendant's negligence, Plaintiff AJK suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. AJK's injuries are permanent and will require more medical care and treatment in the future.

291.    Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff AJK's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

**COUNT II – NEGLIGENT UNDERTAKING (VOLUNTARY UNDERTAKING)**

**(Against Defendants Roblox, Epic Games, Mojang AB, Microsoft and DOES 1-50)**

292.    Plaintiff AJK realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

293.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, distributing, and/or providing access to their respective video game Products and environments to users throughout the United States, including to Plaintiff AJK.

294. An entity undertaking to render services to another which it should recognize as necessary for the protection of the other's person is subject to liability for physical harm resulting from the failure to exercise reasonable care to perform its undertaking. *Feleccia*, 654 Pa. at 342-43; Restatement (Second) of Torts §§ 323, 324A.

295. Each Defendant voluntarily undertook to protect minor users, including AJK, from harm. As alleged in the General Factual Allegations incorporated herein, each Defendant implemented age-based content restrictions, communications limitations, and other safety features for minor users. Each Defendant publicly represented that its video game Products are safe for children and that child safety was a foundational priority. Each Defendant holds itself out as providing a safe digital environment for minors.

296. Each Defendant's voluntary safety undertakings include the specific representations, safety features, parental controls, and age-based restrictions detailed in the Defendant-Specific Allegations, which are incorporated herein.

297. Having voluntarily undertaken to protect minor users, each Defendant was obligated to exercise reasonable care in performing those undertakings.

298. Each Defendant failed to exercise reasonable care in performing its voluntary safety undertakings. Each Defendant's failures include, but are not limited to:

    a. Implementing age-based protections that could be easily circumvented by minors entering a false birthdate, without requiring age verification;

    b. Implementing parental controls that were not automatically enabled and that required parents to access settings through the minor's own account;

    c. Delaying the implementation of screen time controls and other usage-limiting features for years after Defendants knew of the risks of excessive use;

    d. Failing to implement anti-addiction rules despite possessing the technical capability to do so;

    e. Failing to provide any warnings about the risks of excessive use at account setup or during gameplay;

     f.   Failing to monitor for or respond to usage patterns indicating harmful excessive engagement by identified minor users; and

     g.   Simultaneously designing their video game Products to maximize addictive and compulsive use, thereby actively undermining the very safety undertakings Defendants publicly promoted.

299. Each Defendant's failure to exercise reasonable care in performing its voluntary safety undertakings increased the risk of harm to AJK. By implementing partial, inadequate safety measures, each Defendant created a false sense of security that induced parents, including Plaintiff Angie Kesack, to allow their children to use Defendants' Products with less independent oversight than they otherwise would have exercised.

300. Plaintiff Angie Kesack and AJK relied on each Defendant's voluntary safety undertakings to their detriment. In allowing AJK to use Defendants' Products, Plaintiff Angie Kesack relied on Defendants' public representations that their Products were safe for children and on the visible age-based restrictions Defendants had implemented. Had Defendants not made these undertakings, Plaintiff Angie Kesack would have exercised greater independent oversight or would not have permitted AJK to use the Products.

301. Each Defendant's negligent performance of its voluntary safety undertakings was a substantial factor in causing harm to AJK and is the actual and proximate cause of said harm.

302. As a direct and proximate result of each Defendant's negligent undertaking, Plaintiff AJK suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. AJK's injuries are permanent and will require more medical care and treatment in the future.

303. Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff AJK's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT III – NEGLIGENCE (PIED PIPER DOCTRINE)

### (Against Defendants Roblox, Epic Games, Mojang AB, Microsoft and DOES 1-50)

304.    Plaintiff AJK realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

305.    The common law has long recognized that one who intentionally attracts children to an activity, location, or place of business assumes, by that act of attraction, a corresponding duty to:

   a.   Protect the children who have been attracted against the dangers of the setting into which they have been attracted; and

   b.   Guard against the known or anticipatable propensities, weaknesses, and incapacities of children in connection with the dangers of the setting.

As one well known hornbook explains, "[w]hen children are in the vicinity, much is necessarily to be expected of them which would not be looked for on the part of an adult. It may be anticipated that a child will dash into the street in the path of a car, or meddle with a turntable. It may be clear negligence to entrust him with a gun, or to allow him to drive an automobile, or to throw candy where a crowd of boys will scramble for it. There have been a number of 'pied piper' cases, in which street vendors of ice cream, and the like, which attract children into the street, have been held liable for failure to protect them against traffic." W. Page Keeton et al., *Prosser and Keeton on The Law of Torts* § 33, at 200 (5th ed. 1984). *See also e.g., Schwartz v. Helms Bakery Ltd.*, 430 P.2d 68, 70 (Cal. 1967); *Neal v. Shiels, Inc.*, 347 A.2d 102, 108 (Conn. 1974); *Mackey v. Spradlin*, 397 S.W.2d 33, 38 (Ky. App. 1965).

306.    Each Defendant intentionally, deliberately, and for profit, designed, marketed, and operated its virtual playground to attract children and to maximize the time children spend engaged with Defendant's digital environment. Among other things, each Defendant:

   a.   Designed its virtual playground in a way specifically intended to appeal to children;

62

b. Marketed its Product to children through advertising on children's programming and media, through partnerships with children's brands and influencers, and through word-of-mouth mechanics and social features designed to spread among children's peer groups;

c. Collected age information from users, knew that a substantial proportion of its user base consisted of children, and continued to design and optimize its Product to attract and retain child users; and

d. Derived substantial revenue from the engagement of child users, including through microtransactions, advertising, and the increased platform value generated by a large child user base.

307. By intentionally attracting children to their virtual playgrounds, Defendants assumed a duty to exercise reasonable care for the safety of the children they attracted. This duty required Defendants, at minimum, to take reasonable measures to protect children from the foreseeable harms of the environment Defendants created for children, including the foreseeable harm that children, due to developmental immaturity, would be unable to self-regulate their time spent in virtual environments specifically designed to maximize engagement, and would develop disordered, compulsive, and addictive patterns of use.

308. Defendants' duty was heightened by the characteristics of children as a class. In dealing with children, Defendants were required to exercise greater caution than they would in dealing with adults. Defendants knew or should have known that children lack the executive function, impulse control, and developmental maturity to moderate their engagement with virtual environments.

309. Defendants breached their duty of care. Despite intentionally attracting children to their virtual environments and knowing that children constituted a substantial proportion of their user base, Defendants failed to take reasonable measures to protect children from foreseeable harm. Instead, Defendants designed their virtual playgrounds to maximize the duration and frequency of children's engagement, prioritizing revenue over child safety.

310.    Defendants' breach includes, but is not limited to:

a.  Failing to implement adequate safeguards against excessive and compulsive use by children, including effective screen-time limitations, session-length controls, and mandatory break features;

b.  Failing to provide adequate warnings to children and their parents or caregivers about the risks of excessive engagement, including the risk of developing disordered or addictive use patterns; and

c.  Implementing parental controls that were inadequate, difficult to access, and designed in ways that minimized their effectiveness.

311.    As a result of Defendants' breach of the duties identified herein, Plaintiff AJK suffered severe physical and mental harm, as well as economic damages, from Plaintiff's use of Defendants' respective virtual environments.

312.    Each Defendant's breach of its duty of care to Plaintiff AJK was a substantial factor in causing harm to Plaintiff and is the actual and proximate cause of said harm.

313.    As a direct and proximate result of each Defendant's negligence, Plaintiff AJK suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future.

314.    Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff AJK's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

### COUNT IV – NEGLIGENCE – FAILURE TO WARN

**(Against Defendants Roblox, Epic Games, Mojang AB, Microsoft and DOES 1-50)**

303.    Plaintiff AJK realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here. Additionally, or in the alternative, each Defendant is negligent for failing to include warnings on their Products to minor users, and their parents or cargivers, of the likelihood and potentially harmful effects of excessive gameplay.

304.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video game Products used by AJK, each of which are defective and unreasonably dangerous.

305.    Defendants knew, or should have known, that the use of their respective Products was dangerous, harmful, and injurious when used by Plaintiff AJK in a reasonably foreseeable manner.

306.    Each Defendant knew or, by the exercise of reasonable care, should have known that its respective Products posed risks of harm to youth. These risks were known and knowable considering each Defendant's own internal information and knowledge regarding its Product at the time of the Product's development, design, marketing, promotion, advertising, and distribution to AJK. Additionally, each defendant knew that overconsumption of their respective Products was and is dangerous to Defendants' intended class of child customers.

307.    Each Defendant knew, or should have known, that ordinary consumers such as Plaintiff AJK and/or AJK's parents would not have realized the potential risks and dangers of Defendants' respective Products.

308.    At the time each Defendant's Product left their respective control, the Products did not include – nor has they ever included – warnings that the Products and/or overconsumption of the products pose an unreasonable risk of harm to users, particularly minors.

309.    Had Plaintiff AJK and/or Angie Kesack been aware that the Products could cause significant harm such as impacts on brain function, psychological injury, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders, Angie Kesack would not have purchased or allowed AJK to use or continue to use each Defendant's respective Product. Likewise, AJK would not have used or continued to use each Defendant's Product. Alternatively, if Defendants had adequately warned

or instructed AJK's guardian and/or AJK, they would have taken precautions when using each Defendant's respective Product in order to eliminate or mitigate the risk of harm.

310. Each Defendant had a duty to give reasonable and adequate warning of dangers inherent or reasonably foreseeable in the use of its Product in a manner which the manufacturer should reasonably foresee. Moreover, where, as here, Defendants created a special relationship under tort law with Plaintiff AJK, Defendants had a duty to protect AJK from excessive gameplay that could foreseeably cause harm.

311. Each Defendant breached their duty owed to foreseeable users. That breach includes a failure to warn users that Defendants' respective Products cause addiction, compulsive use, and/or other physical and mental injuries, and that Defendants would not limit excessive gameplay.

312. A reasonable company under the same or similar circumstances would have used reasonable care to provide adequate warnings to consumers, and parents of minor consumers.

313. As a direct and proximate result of each Defendant's breach of duty to provide adequate warnings, Plaintiff AJK was harmed and sustained the injuries set forth herein.

314. As a direct and proximate result of each Defendant's negligence, Plaintiff AJK suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. AJK's injuries are permanent and will require more medical care and treatment in the future.

315. Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff AJK's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

### **COUNT V – STRICT PRODUCT LIABILITY – DESIGN DEFECT**
### **(Against Defendants Roblox, Epic Games, Mojang AB, Microsoft and DOES 1-50)**

316. Plaintiff AJK realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

317. At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video game Products used by AJK, each of which are defective and unreasonably dangerous.

318. The video game Products that each Defendant placed into the stream of commerce were defectively designed. The Products were designed to cause addictive and compulsive use, including by minors. The Products are not reasonably fit, suitable, or safe for their intended purpose.

319. The defective conditions of Roblox, Fortnite, and Minecraft rendered them unreasonably dangerous and/or not reasonably safe. The foreseeable risks outweigh the benefits associated with Defendants' designs.

320. The defects in each Defendant's respective designs were present in the Products when the Products left the hands of Defendants and when they were released to the general public to be used in an intended and foreseeable manner.

321. Roblox, Fortnite, and Minecraft, as designed, were unreasonably dangerous, posed a substantial likelihood of harm, and were therefore defective because of the reasons enumerated in this Complaint, including, but not limited to, each Product's design including addictive operant conditioning, each Product's design lacking warnings about the risk of addiction, each Product's design lacking safeguards such as automatic, parent-imposed, or user-imposed time restrictions on gameplay, each Product's design lacking proper minor age verification, and each Product failing to operate as a reasonable user would expect.

322. Each Defendant designed its Products to be addictive and take advantage of the chemical reward system of users' brains to establish compulsive use and addiction.

323. Each Defendant's respective Products were expected to and did reach Plaintiff AJK without substantial change in the condition in which they were designed, manufactured, labeled, marketed, promoted, supplied, and otherwise released into the stream of commerce.

324. AJK used Defendants' Products, Roblox, Fortnite, and Minecraft, in an intended and reasonably foreseeable manner, and the Products were not materially altered prior to their use.

325. Each Defendant knew or, by the exercise of reasonable care, should have known that minors, including AJK, would use the Products without anyone inspecting the Products for addictive or other dangerous features.

326. Reasonable users of Defendants' respective Products would not expect, and Plaintiff AJK herein did not expect, that said Products would pose risks of severe physical and mental harm.

327. Reasonable users of Defendants' Products would not expect that Defendants knew about risks of severe physical and mental harm and nevertheless chose to place their Products into the stream of commerce.

328. Each Defendant could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, such as by designing their respective Products without the harm-causing features listed above, while still providing an optimal gaming experience.

329. At the time each Defendant's Products were designed, developed, distributed to AJK, and played, safer alternative designs existed that were entirely feasible.

330. Each Defendant could have utilized cost effective, reasonably feasible alternative designs to minimize harm caused by their respective Products by implementing elements that include, but are not limited to:

    a. Robust age verification;

    b. Effective parental controls;

    c. The removal of barriers to the enactment of parental controls;

    d. Warnings of health effects of use and extended use upon sign-up;

    e. Opt-in restrictions to the length and frequency of sessions;

    f. Self-limiting tools, including but not limited to session time notifications, warnings, or reports.

g.  Tools to restrict and/or block usage during certain times of day (such as during school hours or late at night);

h.  Tools to restrict and/or limit game play time such as on a weekly or daily basis;

i.  Self-imposed limits for microtransactions; and

j.  Others as set forth herein.

331.  Instead, each Defendant designed their respective Products to aggressively addict users with features that increase use time, frequency of use, and profit to each Defendant, all to the detriment of users' wellbeing.

332.  Each Defendant's respective defective Product, and AJK's use of each Defendant's Product, was the direct and proximate cause of AJK's injuries and harm that include, but are not limited to, impacts on brain function, psychological injury, emotional distress, diminished social interactions, lack of interest in other hobbies, and withdrawal symptoms such as rage, anger, and physical outbursts.

333.  Plaintiff AJK's injuries—physical, emotional, and economic—were reasonably foreseeable to each Defendant at the time of the Products' design, marketing, distribution, and operation.

334.  As a direct and proximate result of each Defendant's defective Products, Plaintiff AJK suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. AJK's injuries are permanent and will require more medical care and treatment in the future.

335.  Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff AJK's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT VI – STRICT PRODUCT LIABILITY – FAILURE TO WARN

### (Against Defendants Roblox, Epic Games, Mojang AB, Microsoft and DOES 1-50)

336. Plaintiff AJK realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here. Additionally, or in the alternative, each Defendant is strictly liable for failing to include warnings on their Products to minor users, and their guardians, of the likelihood and potentially harmful effects of excessive gameplay.

337. At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video game Products used by AJK, each of which are defective and unreasonably dangerous.

338. Each Defendant knew that their respective Products are and were harmful, capable of causing and in fact were designed to cause compulsive, addictive use, particularly in minors, and that such use could result in severe physical, mental, and emotional injuries. Additionally, each defendant knew that overconsumption of their respective Products was and is dangerous to Defendants' intended class of child customers.

339. Each Defendant knew, or should have known, that ordinary consumers such as Plaintiff AJK would not have realized the potential risks of their respective Products.

340. Each Defendant knew, or should have known, that the use of Roblox, Fortnite, and Minecraft was dangerous, harmful, and injurious when used by Plaintiff AJK in a reasonably foreseeable manner.

341. Each Defendant owed a duty to warn consumers of the foreseeable risks and dangers of their respective Products that Defendants knew were present, but were not obvious or known to users, especially underage users, or their caregivers, or any average member of the consuming public.

70

342.    At the time Defendants' respective Products left each Defendant's control, they did not include – nor have they ever included – warnings that the Products pose an unreasonable risk of harm to users, particularly minors.

343.    Each Defendant failed to provide timely and adequate warnings, instructions, and information by, including but not limited to:

a.  failing to ensure the Products included warnings regarding their addictive design that were accurate, conspicuous, and adequate, despite having extensive knowledge of the risks associated with their use;

b.  failing to ensure the Products included warnings advising foreseeable users of the need to self-limit excessive gameplay and what those limits should be;

c.  failing to conduct adequate pre-and-post-market safety testing such that an adequate warning could have been issued to users;

d.  failing to include adequate and conspicuous warnings that would alert users to the dangerous risks of the Products, including but not limited to the risks of causing severe and life-altering physical, mental, and emotional disorders and behaviors in minors, especially those with neurodivergent qualities;

e.  failed to issue warnings to consumers regarding the dangerous risks of the Products even after the sale and/or download of their Products; and

f.  representing that the Products were and are safe for use, when in fact, Defendants knew or should have known that their Products were designed to cause minors to engage in excessive use until they developed an addiction or disordered compulsion to use the Products.

344.    Moreover, each Defendant breached its respective duty of care owed to Plaintiff AJK through their non-feasance, failure to act, and omissions in the development, setup,

71

management, maintenance, operation, marketing, advertising, promotion, supervision, and control of their respective Products. Those breaches include but are not limited to:

 a. designing the Products to be more addictive and to target specific individuals based on information obtained and retained by Defendants and/or third-parties;

 b. failing to implement effective parental controls;

 c. failing to implement reasonably available means for users or their parents to monitor for and limit or deter their own excessive frequency or duration of use of Products, including patterns, frequency, or duration of use that are indicative of addiction, compulsive use, or overuse;

 d. failing to implement reasonably available means to monitor for and limit or deter excessive overspending by minors on in-game downloadable Products and upgrades and in-game purchases and/or microtransactions; and

 e. failing to implement reasonably available means to allow users or their parents to limit or deter use of Products by minors during ordinary times for school or sleep.

345. Each Defendant's failure to adequately warn about its defective Product created a danger of injuries described herein that were reasonably foreseeable at the time of the design, development, and dissemination of the Product.

346. A reasonable company under the same or similar circumstances would have warned and instructed Plaintiff AJK of the dangers of its Product.

347. Had Plaintiff AJK and/or Angie Kesack been aware that the Products could cause significant harm such as impacts on brain function, psychological injury, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders, Angie Kesack would not have purchased or allowed AJK to use or continue to use each Defendant's respective Product. Likewise, AJK would not have used or continued to use each Defendant's respective Product. Alternatively, if Defendants had adequately warned or instructed AJK's guardian and/or AJK, they would have taken precautions

when using each Defendant's respective Product in order to eliminate or mitigate the risk of harm.

348. The addictive nature of each Defendant's defective Product and failure to warn about said Products was a substantial factor in Plaintiff AJK's significant injury, harm, damages, and economic loss. Plaintiff AJK will continue to suffer such harm, damages, and economic loss in the future. AJK's injuries are permanent and will require more medical care and treatment in the future.

349. Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff AJK's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT VII – NEGLIGENCE – DESIGN

**(Against Defendants Roblox, Epic Games, Mojang AB, Microsoft and DOES 1-50)**

350. Plaintiff AJK realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

351. At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video game Products used by AJK, each of which are defective and unreasonably dangerous.

352. Each Defendant knew, or should have known, that the use of Roblox, Fortnite, and Minecraft was dangerous, harmful, and injurious when used by Plaintiff AJK in a reasonably foreseeable manner.

353. Each Defendant knew, or should have known, that ordinary consumers such as Plaintiff AJK would not have realized the potential risks and dangers of Roblox, Fortnite, and Minecraft.

354. Each Defendant owed a duty to all reasonably foreseeable users to design a safe Product.

355. Roblox, Fortnite, and Minecraft, as designed, were unreasonably dangerous, posed a substantial likelihood of harm, and were therefore defective because of the reasons enumerated in this Complaint, including, but not limited to, each Product's design including addictive operant conditioning, each Product's design lacking warnings about the risk of addiction, each Product's design lacking safeguards such as Defendant-imposed and/or user-imposed time restrictions on gameplay, each Product's design lacking proper minor age verification, and each Product failing to operate as a reasonable user would expect.

356. Each Defendant breached their duty by failing to use reasonable care in the design of their respective Products by negligently designing Roblox, Fortnite, and Minecraft to specifically appeal to and to take advantage of minors, who were particularly unable to appreciate the risks of the Products.

357. Each Defendant breached their duty by failing to use cost effective, reasonably feasible alternative designs that would make their respective Products less addictive and harmful to minors, including but not limited to:

    a. Robust age verification;

    b. Effective parental controls;

    c. The removal of barriers to the enactment of parental controls;

    d. Warnings of health effects of use and extended use upon sign-up and/or during gameplay;

    e. Opt-in restrictions to the length and frequency of sessions;

    f. Self-limiting tools, including but not limited to session time notifications, warnings, or reports.

    g. Tools to restrict and/or block usage during certain times of day (such as during school hours or late at night);

    h. Self-imposed limits for microtransactions;

      i.   Tools to restrict and/or limit game play time such as on a weekly or daily basis; and

      j.   Others as set forth herein.

358.    Instead, each Defendant designed their respective Products to aggressively addict users with features that increase use time, frequency of use, and profit to each Defendant, all to the detriment of users' wellbeing

359.    A reasonable company under the same or similar circumstances would have designed a safer product.

360.    Plaintiff was harmed directly and proximately by each Defendant's failure to use reasonable care in the design of its Product.

361.    As a direct and proximate result of each Defendant's negligence, Plaintiff AJK suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. AJK's injuries are permanent and will require more medical care and treatment in the future.

362.    Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff AJK's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT VIII – NEGLIGENCE – ORDINARY

**(Against Defendants Roblox, Epic Games, Mojang AB, Microsoft and DOES 1-50)**

363.    Plaintiff AJK realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

364.    Each Defendant had a duty to exercise reasonable care and caution for the safety of individuals using their respective Products, including AJK.

365.    Each Defendant, in its role as product designer, developer, manufacturer, marketer, and seller, manager of gameplay and access to the game(s) and otherwise engaging in activity

culminating in placing their respective Products into the stream of commerce, owed a duty to exercise ordinary care in designing and placing the Products into the stream of commerce.

366.    Each Defendant also owed a duty to warn users of the hazards of using their respective Products, which each Defendant knew were present in their respective Products, though such hazards were not obvious to users and particularly not so to minor users.

367.    Each Defendant's duties also include a duty to exercise ordinary care and act as a reasonably careful company would under the circumstances.

368.    Each Defendant created harmful and addictive Products and failed to engage in the development of safer alternative designs.

369.    For their own profit, each Defendant chose not to engage in the development of safer alternative designs.

370.    Each Defendant failed to take steps to properly limit excessive and harmful access by minors to their Products and/or inform the minors' guardians of the need to limit such access and provide those guardians with sufficient tools to do so.

371.    Each Defendant was negligent, reckless, and/or careless in failing to exercise ordinary care.

372.    Each Defendant's failure to act in developing a safer alternative design constitutes a breach of their duty of reasonable care.

373.    Each Defendant knew, or should have known, that their Products are harmful, capable of causing extensive physical, mental, emotional, and financial or economic harm and damage, and that minor users are developing disordered and addicted use.

374.    Defendants were and are negligent in failing to provide adequate warnings about the dangers associated with using their Products and in failing to warn users, and the parents of users who are minors, including AJK, about how and when, if ever, to safely use their Products.

375.    Each Defendant was and is negligent in failing to provide users, and their caregivers in the case of users who are minors, including AJK, the tools to ensure that their respective Products are used in a limited and safe manner.

376.    As a result of each Defendant's breach of the herein identified duties and resulting negligence, Plaintiff AJK suffered severe physical and mental harm, as well as economic damages, from Plaintiff's use of Defendants' respective Products.

377.    Each Defendant's breach of duty of care to Plaintiff AJK was a substantial factor in causing harm to Plaintiff and is the actual and proximate cause of said harm.

378.    As a direct and proximate result of each Defendant's negligence, Plaintiff AJK suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. AJK's injuries are permanent and will require more medical care and treatment in the future.

379.    Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff AJK's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT IX – INTENTIONAL MISREPRESENTATION

### (Against Defendants Roblox, Epic Games, Mojang AB, Microsoft and DOES 1-50)

380.    Plaintiff AJK realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

381.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video game Products used by AJK, each of which are defective and unreasonably dangerous.

382.    As detailed herein, each Defendant knew about the defective conditions of their respective Products and that the Products posed serious health risks to users, particularly minors.

383.    Each Defendant designed their respective Product with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that

abuse and compulsive use by youth can lead to injury, but concealed this information from the public and Product users, including Plaintiff AJK.

384.    Each Defendant knew of the risks associated with the use of their respective Products based on internal research and external studies known within the industry.

385.    Each Defendant could have disclosed the defective condition of their respective Products to the public and could have advised that the Products posed serious health risks to users, particularly youth. No Defendant took such action; instead, each Defendant opted to omit the safety risks from any disclosures of marketing practices.

386.    Each Defendant knowingly and intentionally misrepresented that their respective Products were safe for use, and safe as educational tools, to further entice users to continue engaging with their respective Products, including Plaintiff AJK, while simultaneously knowing that their respective Products each caused addiction and compulsive use.

387.    Defendant Roblox Corp. stated that it has "built a platform with safety at the foundation," that it has a "commitment to safety and civility," and that it consulted "child development experts" and "examined global industry standards" when creating recommendations for its Product. Further, Roblox Corp. stated that "safety is and always has been foundational to everything [it does] at Roblox," that "[s]afety underpins everything [it does] at Roblox, particularly the safety of [its] youngest users," and finally that it "spend[s] hundreds of millions of dollars each year to meet [its] safety mission."

388.    Defendant Epic Games stated that it wants its Product to be a "safe place for [users]" and that its Product is educational and safe for use in classrooms. Defendant Epic Games also states that it wants to "be on the forefront of creating fun and safe games and experiences for people of all ages."

389.    Defendants Microsoft and Mojang stated that they will "hold [them]selves accountable for making Minecraft as safe as possible for everyone." Defendants Microsoft and Mojang further state that it is "so important that [their] games are a safe and welcoming place for all players," that "player safety is a priority for Mojang to ensure everyone feels safe," and

that their "community standards help [them] build a community that is open and safe for everyone."

390. Each Defendant's statements about the safety of their respective Products are false and misleading, and each Defendant's omission of the potential harm caused by Defendants' respective Products is misleading and deceitful.

391. Each Defendant intended for users, including Plaintiff AJK, to rely on their representations that their respective Products were safe for use to keep users engaging with their Products and increase their profits, and purposefully marketed their Products to minors for that reason.

392. However, each Defendant had no reasonable grounds to believe that their respective Products were safe given the internal and external research on addiction associated with video game use and given the global recognition of video game addiction. Each Defendant knowingly made false statements about the safety of their respective Products.

393. Each Defendant failed to disclose to users, including Plaintiff AJK, that their Products are designed to create and sustain addiction.

394. Each Defendant intentionally failed to disclose to users the strategies and features designed and employed in their Products to create and sustain addiction.

395. Each Defendant intentionally failed to disclose their addictive strategies and features to entice users to continue gameplay and increase profits.

396. If each Defendant had not concealed, omitted, and misrepresented facts regarding the safety of their Products, and had Plaintiff AJK and/or Angie Kesack been aware that the Products could cause significant harm such as impacts on brain function, psychological injury, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders, Angie Kesack would not have purchased or allowed AJK to use or continue to use each Defendant's respective Product. Likewise, AJK would not have used or continued to use Defendants' Products. Alternatively, if Defendants had adequately warned or instructed AJK's guardian and/or AJK, they would have taken precautions

when using each Defendant's respective Product in order to eliminate or mitigate the risk of harm.

397. Plaintiff AJK and Plaintiff's guardian were unaware of the dangerous and addictive nature of Defendants' respective Products. Plaintiff reasonably relied on each Defendant's representations that its respective Product was safe for use, particularly for minors.

398. Plaintiff AJK and Plaintiff's guardian reasonably relied on each Defendant's representations and did not know, nor had any way of knowing, about the misrepresentations about Defendants' respective Products.

399. A reasonable person, including Plaintiff AJK and Plaintiff's guardian, would find information that impacted the users' health, safety, and well-being – such as the serious adverse health risks associated with the use of Defendants' Products – to be important when deciding whether to purchase, download, use, or to continue to use, those Products. Thus, Plaintiff AJK and Plaintiff's guardian justifiably relied on each Defendant's misrepresentations that the Products were safe when purchasing, downloading, playing, continuing to use, and/or purchasing downloadable game content.

400. Because of Plaintiff AJK's and Plaintiff's guardian's reasonable reliance on each Defendant's representations, Plaintiff sustained physical and psychological harm, as well as economic damages.

401. As a direct and proximate result of each Defendant's material misrepresentations and false statements, Plaintiff AJK suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. AJK's injuries are permanent and will require more medical care and treatment in the future.

402. Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff AJK's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

**COUNT X – NEGLIGENT MISREPRESENTATION**

**(Against Defendants Roblox, Epic Games, Mojang AB, Microsoft and DOES 1-50)**

403.    Plaintiff AJK realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

404.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video game Products used by AJK, each of which are defective and unreasonably dangerous.

405.    As detailed herein, Defendants knew about the defective conditions of their respective Products and that the Products posed serious health risks to users, particularly minors.

406.    Each Defendant designed their respective Product with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse and compulsive use by youth can lead to injury, but concealed this information from the public and Product users, including Plaintiff AJK.

407.    Each Defendant knew of the risks associated with the use of their respective Products based on internal research and external studies known within the industry.

408.    Each Defendant could have disclosed the defective condition of their respective Products to the public and could have advised that the Products posed serious health risks to users, particularly youth. No Defendant took such action; instead, each Defendant opted to omit the safety risks from any disclosures of marketing practices.

409.    Each Defendant knowingly and intentionally misrepresented that their respective Products were safe for use, and safe as an educational tool, to further entice users to continue engaging with their Products, including Plaintiff AJK, while simultaneously knowing that their respective Products each caused addiction and compulsive use.

410.    Defendant Roblox Corp. stated that it has "built a platform with safety at the foundation," that it has a "commitment to safety and civility," and that it consulted "child

development experts" and "examined global industry standards" when creating recommendations for its Product. Further, Roblox Corp. stated that "safety is and always has been foundational to everything [it does] at Roblox," that "[s]afety underpins everything [it does] at Roblox, particularly the safety of [its] youngest users," and finally that it "spend[s] hundreds of millions of dollars each year to meet [its] safety mission."

411.    Defendant Epic Games stated that it wants its Product to be a "safe place for [users]" and that its Product is educational and safe for use in classrooms. Defendant Epic Games also states that it wants to "be on the forefront of creating fun and safe games and experiences for people of all ages."

412.    Defendants Microsoft and Mojang stated that they will "hold [them]selves accountable for making Minecraft as safe as possible for everyone." Defendants Microsoft and Mojang further state that it is "so important that [their] games are a safe and welcoming place for all players," that "player safety is a priority for Mojang to ensure everyone feels safe," and that their "community standards help [them] build a community that is open and safe for everyone."

413.    Each Defendant's statements about the safety of their respective Products are false and misleading, and each Defendant's omission of the potential harm caused by Defendants' respective Products is misleading and deceitful.

414.    Each Defendant intended for users, including Plaintiff AJK and Plaintiff's guardian, to rely on their representations that their respective Products were safe for use to keep users engaging with their Products and increase their profits, and purposefully marketed their Products to minors for that reason.

415.    However, each Defendant had no reasonable grounds to believe that their respective Products were safe given the internal and external research on addiction and given the global recognition of video game addiction. Each Defendant made false statements about the safety of their respective Products.

416.    Each Defendant failed to disclose to users, including Plaintiff AJK and Plaintiff's guardian, that their respective Products are designed to create and sustain addiction.

417.    Each Defendant failed to disclose to users the strategies and features designed and employed in their respective Products to create and sustain addiction.

418.    Each Defendant failed to disclose their addictive strategies and features to entice users to continue gameplay and increase profits.

419.    If each Defendant had not concealed, omitted, and misrepresented facts regarding the safety of their Products, and had Plaintiff AJK and/or Angie Kesack been aware that the Products could cause significant harm such as impacts on brain function, psychological injury, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders, Angie Kesack would not have purchased or allowed AJK to use or continue to use each Defendant's respective Product. Likewise, AJK would not have used or continued to use Defendants' respective Products. Alternatively, if Defendants had adequately warned or instructed AJK's guardian and/or AJK, they would have taken precautions when using each Defendant's respective Product in order to eliminate or mitigate the risk of harm.

420.    Plaintiff AJK and Plaintiff's guardian were unaware of the dangerous and addictive nature of each Defendant's Products. Plaintiff reasonably relied on each Defendant's representations that its Products were safe for use, particularly for minors.

421.    Plaintiff AJK and Plaintiff's guardian reasonably relied on each Defendant's representations and did not know, nor had any way of knowing, about the misrepresentations about Defendants' respective Products.

422.    A reasonable person, including Plaintiff AJK and Plaintiff's guardian, would find information that impacted the users' health, safety, and well-being – such as the serious adverse health risks associated with the use of Defendants' Products – to be important when deciding whether to purchase, download, use, or to continue to use, those Products. Thus, Plaintiff AJK and Plaintiff's guardian justifiably relied on each Defendant's misrepresentations that the

Products were safe when purchasing, downloading, playing, continuing to use, and/or purchasing downloadable game content.

423. Because of Plaintiff AJK's and Plaintiff's guardian's reasonable reliance on each Defendant's representations, Plaintiff sustained physical and psychological harm, as well as damages.

424. Each Defendant's misrepresentations were a substantial factor in causing harm to Plaintiff AJK, who suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. Thus, Plaintiff seeks actual damages according to proof.

## COUNT XI – FRAUD

**(Against Defendants Roblox, Epic Games, Mojang AB, Microsoft and DOES 1-50)**

425. Plaintiff AJK realleges and incorporates by reference all of the foregoing allegations as if repeated in full here.

426. At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video game Products used by AJK, each of which are defective and unreasonably dangerous.

427. As detailed herein, each Defendant knew about the defective conditions of its Products and that the Products posed serious health risks to users, particularly minors, young adults, and neurodivergent individuals.

428. Each Defendant knew their Products posed risks to minors, like AJK, based on internal research and external studies known in the industry and to each Defendant; yet each Defendant misrepresented the safety and value of their games for the purpose of inducing users, like AJK, to purchase/download the game and to continue using Defendants' Products and encourage the addiction knowingly caused by Defendants' respective Products.

429.    Defendant Roblox Corp. stated that it has "built a platform with safety at the foundation," that it has a "commitment to safety and civility," and that it consulted "child development experts" and "examined global industry standards" when creating recommendations for its Product. Further, Roblox Corp. stated that "safety is and always has been foundational to everything [it does] at Roblox," that "[s]afety underpins everything [it does] at Roblox, particularly the safety of [its] youngest users," and finally that it "spend[s] hundreds of millions of dollars each year to meet [its] safety mission."

430.    Defendant Epic Games stated that it wants its Product to be a "safe place for [users]" and that its Product is educational and safe for use in classrooms. Defendant Epic Games also states that it wants to "be on the forefront of creating fun and safe games and experiences for people of all ages."

431.    Defendants Microsoft and Mojang stated that they will "hold [them]selves accountable for making Minecraft as safe as possible for everyone." Defendants Microsoft and Mojang further state that it is "so important that [their] games are a safe and welcoming place for all players," that "player safety is a priority for Mojang to ensure everyone feels safe," and that their "community standards help [them] build a community that is open and safe for everyone."

432.    Each Defendant's statements about the safety of their respective Products are false and misleading, and each Defendant's omission of the potential harm caused by Defendants' respective Products is misleading and deceitful.

433.    Each Defendant could have disclosed the defective condition of their Products to the public and could have advised that the Products posed serious health risks to users, particularly youth. No Defendant took such action; instead, each Defendant opted to omit the safety risks from any disclosures or marketing practices.

434.    Each Defendant knowingly and intentionally misrepresented that their respective Products were safe for use to further entice users to continue engaging with their Products, including Plaintiff AJK.

435. Each Defendant intended for users, including Plaintiff AJK and Plaintiff's guardian, to rely on their representations that their respective Products were safe for use to keep users engaging with their Products and increase their profits, and purposefully marketed their Products to minors for that reason.

436. If each Defendant had not concealed, omitted, and misrepresented facts regarding the safety of their Products, and had Plaintiff and/or Angie Kesack been aware that the Products could cause significant harm such as impacts on brain function, psychological injury, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders, Angie Kesack would not have purchased or allowed AJK to use or continue to use each Defendant's respective Product. Likewise, AJK would not have used or continued to use Defendants' respective Products. Alternatively, if Defendants had adequately warned or instructed AJK's guardian and/or AJK, they would have taken precautions when using each Defendant's respective Product in order to eliminate or mitigate the risk of harm.

437. However, each Defendant had no reasonable grounds to believe that their respective Products were safe given the internal and external research on addiction and given the global recognition of video game addiction. Each Defendant knowingly made false statements about the safety of their respective Products.

438. As a direct and proximate result of each Defendant's material omissions, Plaintiff AJK and Plaintiff's guardian had no reason to believe that each of Defendant's Products were unsafe for children to use.

439. Plaintiff AJK and Plaintiff's guardian reasonably relied on each Defendant's misrepresentations that each of their Products was safe for use.

440. A reasonable person, including Plaintiff AJK and Plaintiff's guardian, would find information that impacted the users' health, safety, and well-being – such as the serious adverse health risks associated with the use of Defendants' respective Products – to be important when deciding whether to purchase, download, use, or to continue to use, those Products. Thus,

Plaintiff AJK and Plaintiff's guardian justifiably relied on each Defendant's misrepresentations that the Products were safe when purchasing, downloading, playing, continuing to use, and/or purchasing downloadable game content.

441.   As a direct and proximate result of each Defendant's material misrepresentations and false statements, Plaintiff AJK suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. AJK's injuries are permanent and will require more medical care and treatment in the future.

442.   Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff AJK's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT XII – VIOLATION OF STATE UNFAIR COMPETITION LAW

### (Against Defendants Roblox, Epic Games, Mojang AB, Microsoft and DOES 1-50)

443.   Plaintiff AJK realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

444.   Defendants are corporations that are subject to Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§201-1 – 201-9.2, as well as Pennsylvania common law prohibiting any unlawful, unfair, or fraudulent business acts or practices and unfair, deceptive, untrue or misleading advertising.

445.   By the conduct described in detail above and incorporated herein, each Defendant engaged in unfair and deceptive acts in violation of applicable state consumer protection laws.

446.   Each Defendant knowingly engaged in the production, design, distribution, and sale of the Products to users, including AJK, which were unsafe and addictive, particularly for minors.

447.   Each Defendant promoted their Products to users, especially minor users, while concealing harmful information about the addictive and unsafe nature of said Products.

448.     These business practices that Defendants have engaged in are fraudulent and deceptive practices in violation of state consumer protection laws.

449.     Each Defendant's business practices are also unfair in violation of state consumer protection laws. Each Defendant's actions are unethical at minimum, and the benefit of employing their deceptive and addictive features does not, in any circumstance, outweigh the harm that Plaintiff AJK suffered.

450.     As a direct and proximate result of the foregoing acts and practices, each Defendant has received, or will receive, income, profits, and other benefits, which they would not have received if they had not engaged in the violations of the consumer protection laws described herein.

451.     As a direct and proximate result of each Defendant's conduct, Plaintiff AJK sustained injury and economic losses, including hundreds of dollars per year in video game related spending. Had each Defendant not engaged in these fraudulent and deceptive practices, Plaintiff would not have sustained the aforementioned economic injuries.

452.     As a result of each Defendant's conduct, Plaintiff AJK sustained significant injuries.

## **PRAYER**

WHEREFORE, Plaintiff prays for judgment against each Defendant as to each relevant cause of action as follows:

1.      For Plaintiff AJK's general damages, including pain and suffering and emotional distress, according to proof at the time of trial;

2.      For Plaintiff AJK's past and future economic and special damages according to proof at the time of trial;

3.      For Plaintiff AJK's medical and related expenses according to proof at the time of trial;

4.      For Plaintiff AJK's prejudgment interest according to proof at the time of trial;

5.      For Plaintiff AJK's costs of suit herein;

6.     For Injunctive relief;

7.     For Attorneys' fees;

8.     For exemplary and/or punitive damages according to proof at the time of trial;

and,

9.     For such other and further relief, whether at law or in equity, that this Court deems just and proper.

DATED: March 5, 2026

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

_____

Ryan Ziminskas (PA Bar No. 332975)
7718 Wood Hollow Drive + Suite 105
Austin, Texas 78731
(T) 512.337.8430
(F) 512.727.3432
*rziminskas@scott-scott.com*

***Attorneys for Plaintiffs***

## **CERTIFICATE OF SERVICE**

The foregoing document was served on all interested parties electronically via ECF through the United States District Court, Eastern District of Pennsylvania ECF website, addressed to all parties appearing on the Court's ECF service list.

DATED: March 5, 2026                               **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

Ryan Ziminskas (PA Bar No. 332975)
7718 Wood Hollow Drive + Suite 105
Austin, Texas 78731
(T) 512.337.8430
(F) 512.727.3432
*rziminskas@scott-scott.com*

**Attorneys for Plaintiffs**